**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| In re:<br><br>BIG THORNE PROJECT AND 2008 TONGASS FOREST PLAN<br>__________<br><br>SOUTHEAST ALASKA CONSERVATION COUNCIL, *et al.*,<br><br>*Plaintiffs-Appellants*,<br><br>CASCADIA WILDLANDS, *et al.*,<br><br>*Plaintiffs*<br><br>v.<br><br>UNITED STATES FOREST SERVICE, *et al.*,<br><br>*Defendants-Appellees*,<br><br>and<br><br>STATE OF ALASKA, *et al.*,<br><br>*Intervenor Defendants- Appellees*. | No. 15-35232 |

**BIG THORNE APPELLANTS' EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 (RELIEF NECESSARY BY APRIL 17, 2015)**

## CIRCUIT RULE 27-3 CERTIFICATE

I, Thomas S. Waldo, certify the following facts to be true, pursuant to Circuit Rule 27-3(a):

1. I am one of the attorneys for Plaintiffs-Appellants Southeast Alaska Conservation Council, Alaska Wilderness League, National Audubon Society, and Sierra Club in *Southeast Alaska Conservation Council v. U.S. Forest Service*, D. Ct. No. 1:14-cv-00013-RRB (collectively, the Big Thorne Appellants). This case concerns the Big Thorne timber sale project (Big Thorne) in the Tongass National Forest (the Tongass) in Southeast Alaska. Big Thorne is the largest timber sale project in the Tongass in more than 20 years, authorizing logging of approximately 6,200 acres of old growth and 46 miles of new roads on central Prince of Wales Island.

2. The Big Thorne Appellants request relief by April 17, 2015. The U.S. Forest Service (the Forest Service) has awarded a contract to Viking Lumber Company (Viking) for the Big Thorne Integrated Resource Timber Sale, which contains most of the old growth logging authorized in the Big Thorne project decision. On March 26, 2015, the district court granted the Big Thorne Appellants' motion for an injunction pending appeal. Big Thorne activities are enjoined until April 15, 2015. Subsequent to the district court's injunction, the parties agreed to propose a schedule to the Court, described below, in which the

timber sale operator would agree to refrain from operations until April 18 to allow more time for briefing and resolution of the emergency motions.

3. The Tongass is a temperate rainforest consisting largely of old growth forest, in which the dominant trees are generally more than 300 years old. These old growth trees provide essential habitat for a variety of species, including salmon, bears, goshawks, Sitka black-tailed deer (deer), and the Alexander Archipelago wolf (wolf). The Tongass's low-elevation, high-volume old growth habitats are particularly important to deer, especially during severe winters, because these stands intercept snow, provide thermal cover, and support the largest biomass of forage. Wolves also spend most of their time in low-elevation old growth forests, and in the Big Thorne area they feed primarily on deer. Thus, deer winter habitat is the most important limiting factor for deer and a good measure of habitat quality for wolves. Wolf experts have concluded that wolf persistence is directly linked to deer populations and ultimately to the availability of deer winter habitat. Old growth logging reduces deer habitat capability.

4. During the Big Thorne environmental review, the Forest Service explained that modeled deer habitat capability in every geographic scale the agency considered already falls below the level the agency recognizes as generally required to support sustainable wolf populations while also accounting for human

deer hunting—18 deer per square mile. Big Thorne will drive deer habitat capability even farther below this level.

5. Members of the Big Thorne Appellants and many other members of the public live in and around, and use and enjoy, the Big Thorne area for its existing values. Subsistence hunting, fishing, trapping, and gathering activities are a major focus of life for many residents on Prince of Wales Island. People depend upon these subsistence practices to provide food and supplemental income, but also to perpetuate cultural customs, traditions, and social values associated with self-reliance. Of all subsistence resources, deer support the highest hunting and use of all terrestrial species in Southeast Alaska. The Big Thorne project area in particular is an important deer hunting area for nearby communities.

6. In the district court, this case was consolidated with two others, and there is presently pending an unopposed motion to consolidate the appeals in this Court. My law firm filed two of the cases. The present case—originally numbered 1:14-cv-00013-RRB in the district court—challenges the decision to approve the Big Thorne project (the Big Thorne Appeal). On behalf of an overlapping but different group of clients, we filed a separate lawsuit challenging the Tongass Land Management Plan (the Forest Plan), the programmatic forest management plan for the entire Tongass. That case was number 1:14-cv-00014-RRB in the district court and is now number 15-35244 in this Court (the Forest Plan Appeal). The two

cases have different plaintiffs, defendants, and intervenor-defendants. They also challenge different agency actions, raise different claims, and seek different permanent relief. At this time, however, Plaintiffs-Appellants in both cases seek the same temporary relief pending appeal: an injunction against old growth logging and new road construction in the Big Thorne project. In the two motions we have filed today, we refer to the Plaintiffs-Appellants in the present case as the Big Thorne Appellants and to those in the other case as the Forest Plan Appellants. A third case—*Cascadia Wildlands v. Cole*—was filed by different counsel on behalf of different plaintiffs. It is district court number 1:14-cv-00015-RRB and Ninth Circuit case number 15-35233. In the district court, all three cases were consolidated under number 1:14-cv-00013-RRB with a new caption "*In re: Big Thorne Project and 2008 Tongass Forest Plan*."

7. The Big Thorne Appellants have diligently pursued this case to avoid irreparable harm. They filed their complaint one day after the Forest Service announced the Big Thorne decision. *See* Doc. 1 (filed Aug. 22, 2014); Doc. 32-29 (decision dated Aug. 21, 2014). They then negotiated a briefing schedule, approved by the district court, designed to secure a decision from the district court before the logging season started on April 1, 2015. Doc. 18; Doc. 19 (district court approving expedited schedule). On March 16, 2015, when there was not yet a decision from the district court, they filed a motion for preliminary injunction.

Doc. 85. On March 20, 2015, the district court issued its decision denying all of plaintiffs' summary judgment motions and entered judgment for defendants. App. at 170-194. On March 26, 2015, the Big Thorne Appellants filed a notice of appeal and a motion for injunction pending appeal in the district court. Doc. 93; Doc. 94. On March 31, 2015, the district court entered an injunction pending appeal lasting until April 15, 2015. App. at 195-197.

8. Since filing this appeal, I have been in frequent email communication with counsel for all parties. The parties have agreed to propose the following schedule to the Court:

- Viking agrees that ground disturbing activities will not commence on the Big Thorne timber sale contract before April 18 based on keeping the following schedule:
- All Plaintiffs-Appellants will file all of their emergency motions by midnight (PDT) on Friday, April 3;
- Defendants-Appellees and Intervenor Defendants-Appellees will file their responses by midnight (PDT) on Thursday, April 9;
- All Plaintiffs-Appellants will file all reply briefs by midnight (PDT) on Monday, April 13.

9. The parties will be served with this motion through the Court's electronic case filing system.

10. The office addresses, email addresses, and telephone numbers of other counsel are as follows:

Allen Brabender
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7415
Washington, D.C. 20044
T: 202.514.5316
E: Allen.Brabender@usdoj.gov

David Glazer
U.S. Department of Justice
Environment and Natural Resources Division
301 Howard Street, Suite 1050
San Francisco, CA 94105
T: 415.744-6477
E: David.Glazer@usdoj.gov

Attorneys for Federal Defendants-Appellees

Thomas E. Lenhart
Assistant Attorney General
P.O. Box 110300
Juneau, AK 99811-0300
T: 907.465.3600
E: tom.lenhart@alaska.gov

Attorneys for Intervenor Defendant-Appellee State of Alaska

Julie A. Weis
Haglund Kelley LLP
200 SW Market, Suite 1777
Portland, OR 97201
T: 503.225.0777
E: jweis@hk-law.com

Howard S. Trickey
Holland & Knight LLP
601 W. 5th Avenue, Suite 700
Anchorage, AK 99501
T: 907.263.6365
E: howard.trickey@hklaw.com

Attorneys for Intervenor Defendants-Appellees Alaska Forest Association, *et al*.

James F. Clark
Law Offices of James F. Clark
1109 C Street
Juneau, AK 99801
T: 907.586.0122
E: jfclarkiii@gmail.com

Steven W. Silver
Robertson Monagle and Eastaugh
1810 Samuel Morse Drive, Suite 202
Reston, VA 20190
T: (703) 527-4414
E: ssilver628@aol.com

Attorneys for Intervenor Defendants-Appellees City of Craig, *et al*.

Richard W. Goeken
Smith, Currie & Hancock LLP
1025 Connecticut Avenue N.W., Suite 600
Washington, D.C. 20036
T: 202.452.2140
E: rwgoeken@smithcurrie.com

Attorneys for Intervenor Defendant Viking Lumber Co., Inc.

Christopher G. Winter
Crag Law Center
917 SW Oak Street, Suite 417
Portland, OR 97205
T: 503-525-2725
E: chris@crag.org

Ralph O. Bloemers
Crag Law Center
917 SW Oak Street, Suite 417
Portland, OR 97205
T: 503-525-2727
E: ralph@crag.org

Oliver Stiefel
Crag Law Center
917 SW Oak Street, Suite 417
Portland, OR 97205
T: 503-525-2727
E: oliver@crag.org

Attorneys for Plaintiffs-Appellants Cascadia Wildlands, The Boat Company, Center for Biological Diversity, and Greenpeace in *Cascadia Wildlands v. Cole*, No. 15-35233 (D. Ct. No. 1:14-cv-00015-RRB)

Gabriel W. Scott
Gabriel W. Scott, Attorney at Law
P.O. Box 156
Cordova, AK  99574
T: 907.264.6737
E: gabescott@icloud.com

Attorney for Plaintiff-Appellant Cascadia Wildlands in *Cascadia Wildlands v. Cole*, No. 15-35233 (D. Ct. No. 1:14-cv-00015-RRB)

Respectfully submitted this 3rd day of April, 2015

*s/ Thomas S. Waldo*

Thomas S. Waldo (AK Bar # 9007047)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801-1145
T: 907.500.7123
F: 907.463.5891
E: twaldo@earthjustice.org

*Attorneys for Plaintiffs-Appellants Southeast Alaska Conservation Council, et al.*

Pursuant to Federal Rule of Appellate Procedure 8(a) and Ninth Circuit Rule 27-3, Plaintiffs-Appellants Southeast Alaska Conservation Council, et al. (collectively, the Big Thorne Appellants) move this Court for an order enjoining the U.S. Forest Service (the Forest Service) from allowing imminent, irreparable harm from old growth logging and associated road construction from the Big Thorne timber sale project (Big Thorne), the largest timber sale project in Alaska's Tongass National Forest in more than twenty years. There is ample timber supply already available to the industry to maintain operations consistent with current levels during the 2015-16 logging seasons. The Big Thorne Appellants suggest expediting the appeal with the hope of resolving the case in advance of the 2016 logging season.

## INTRODUCTION

Last year the U.S. Fish and Wildlife Service concluded that the Alexander Archipelago wolf might have to be listed for protection under the Endangered Species Act (the ESA), citing the Forest Service's ongoing destruction of the Tongass's old growth forest as a principal basis for its decision. *See* Doc. 35-65 at 4, 9-10. Undaunted, the Forest Service moved ahead with a record-breaking timber sale project, authorizing logging of roughly 6,200 acres of old growth forest on central Prince of Wales Island. The logging is expected to commence on April 18, 2015, at a rate of up to 4.5 million board feet (mmbf) per month.

*See* Dahlstrom Decl., *Cascadia Wildlands v. Cole*, No. 1:14-cv-00015-RRB, Doc. 86-1 at 7, ¶19 (describing expected logging of 144 thousand board feet (mbf) per day); App. at 195-197 (district court enjoining activities until April 15, 2015);[1] *infra* pp. ii-iii (explaining parties agreed logging would be further delayed until April 18, 2015).

In approving this massive sale, the Forest Service acted unlawfully under the National Forest Management Act, 16 U.S.C. § 1600 et seq., the Tongass Timber Reform Act, *id.* § 539d(a), and the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (NEPA). First, the Forest Service's analysis of, and justification for, Big Thorne is based on a flawed market demand analysis that led the Forest Service to greatly exaggerate the volume goal for needed timber. The agency's flawed analysis led it to concentrate logging in a single timber sale project that is larger than any in twenty years and fails to ensure protection of old growth habitat vital to deer, an animal of critical importance to hunters and essential to wolves. Second, the Forest Service acted unlawfully when it failed to comply with NEPA's regulatory requirements, 40 C.F.R § 1502.22, for addressing missing information regarding the wolf's precarious population decline.

[1] For the Court's convenience, the primary documents cited in this motion are included in the attached appendix (App.). Other documents are identified by their ECF document number (Doc.).

## BACKGROUND

Big Thorne is located on the north portion of Prince of Wales Island and encompasses approximately 232,000 acres. App. at 73. In the Big Thorne Project Record of Decision (the ROD), the Forest Supervisor approved logging of 149 mmbf of timber, encompassing approximately 6,186 acres of old growth forest. App. at 120. The Forest Service also approved construction of approximately 46 miles of new roads and reconstruction of more than 36 miles of existing roads. *Id*. In support of these decisions, the Forest Service prepared the Big Thorne Project Final Environmental Impact Statement (the FEIS).

### I. DEER, WOLVES, AND SUBSISTENCE HUNTERS DEPEND UPON THE TONGASS'S OLD GROWTH FOREST.

The Tongass's stands of old growth trees provide essential habitat for Sitka black-tailed deer (deer) and the wolf, but the loss of old growth habitat due to decades of logging has compromised the wolf-deer-human hunter dynamic.

#### A. Old Growth Forest Provides Essential Habitat for Wolves and Deer.

Wolves on Prince of Wales Island and the smaller surrounding islands (the Prince of Wales Archipelago) make up a significant percentage of the overall wolf population in Southeast Alaska, "perhaps as much as 30 percent." App. at 13. According to the Forest Service, "these populations are are [sic] more sensitive to human activity and habitat disturbance than wolf populations elsewhere in the state." App. at 59.

Wolves spend most of their time in low-elevation old growth forests and they feed primarily on deer. App. at 97. Low-elevation old growth habitats are "particularly important" to deer, App. at 93, and, as a result, winter habitat is considered the "most important limiting factor[]" for deer. App. at 52. Because wolves feed on deer, the Forest Service considers deer winter habitat "a good measure of habitat quality for wolves." App. at 97; *see also* App. at 5 ("wolf persistence is directly linked to deer populations and ultimately to deer habitat capability").

"Timber harvest of important deer winter range reduces modeled deer habitat capability over the long term." App. at 61; *see also* App. at 56 (the Forest Service explaining that "the amount of habitat capability reduction . . . is directly related to the amount of timber harvest").

Here, the FEIS acknowledged that deer habitat capability in all of the Big Thorne wildlife analysis areas[2] already falls below the level the Forest Service generally considers "necessary to maintain a sustainable wolf population and meet human harvest demands" —18 deer per square mile. App. at 71. Big Thorne will drive those areas even farther below. *See* App. at 103d (Alternative 3 at stem

---

[2] The Forest Service uses wildlife analysis areas, which are land divisions, in its analysis of subsistence and wildlife impacts. App. at 3.

exclusion resulting in 5.5 to 14.2 deer per square mile).[3] The same is true, unfortunately, at much larger geographic scales. For example, in the entire northern portion of Prince of Wales Island (roughly 1,390,720 acres)[4] deer habitat capability is 13.6 deer per square mile and will drop to 12.9. *See* App. at 103b (Table WLD-26) ((Alt. 3) stem exclusion). Even at the yet larger scale of the North Central Prince of Wales Island Biogeographic Province (approximately 1,541,120 acres)[5] "deer habitat capability is currently 14.6 deer per square mile" and will drop to 13.9 at stem exclusion after Big Thorne. App. at 103b (Alt. 3).

B. The Forest Service Expects That Big Thorne May Result in a "Significant Restriction" of Subsistence Deer Hunting.

"Subsistence hunting, fishing, trapping, and gathering activities are a major focus of life for many residents on Prince of Wales Island." App. at 102. Deer support the highest hunting and use of all terrestrial species in Southeast Alaska. App. at 52. The Big Thorne project area in particular is "an important deer hunting

[3] Twenty to 30 years after clear-cutting, there is a 100-150 year period, known as "stem exclusion," during which time the forest understory, the key deer habitat feature, dies. App. at 56; *see also* Doc. 32-35 at 7 (describing stem exclusion stage); Doc. 32-23 at 6 (picture of stem exclusion).

[4] This includes the following wildlife analysis areas: 1107, 1212, 1213, 1214, 1315, 1316, 1317, 1318, 1319, 1323, 1332, 1420, 1421, 1422, 1527, 1528, 1529, and 1530. App. at 103b (Table WLD-26, n.3). The area includes approximately 2,173 square miles, Doc. 32-57 at 4 (Table WL3, Column "Sq Mi"), or 1,390,720 acres.

[5] This includes 21 wildlife analysis areas, App. at 103b, encompassing approximately 2,408 square miles, Doc. 32-57 at 4 (Table WL3, Column "Sq Mi"), or 1,541,120 acres.

area” for nearby communities. Doc. 32-58 at 37; *see also id*. at 57 (explaining many residents “depend heavily on subsistence hunting and fishing to meet their basic needs”).

The Forest Service acknowledged in the FEIS that Big Thorne’s effects on deer raised “special concern” because of the deer’s “importance to wolves and subsistence users.” *id.* at 37, and that Big Thorne “result[s] in higher risk that there will be insufficient number of deer to sustain wolves and hunting.” Doc. 32-67 at 13. In fact, the agency concluded that Big Thorne “may result in a significant restriction of subsistence uses of deer . . . .” App. at 128.

## II. THE FOREST SERVICE REFUSED TO OBTAIN MISSING INFORMATION REGARDING THE WOLF POPULATION BEFORE APPROVING THIS RECORD-BREAKING LOSS OF WOLF HABITAT.

In the FEIS, the Forest Service based its understanding of the current wolf population on the Prince of Wales Archipelago on a 1996 estimate prepared by Dr. David Person, Ph.D, a recently retired Alaska Department of Fish & Game wolf biologist. App. at 96 (citing Person et al. 1996). The Forest Service explained that it is in the process of obtaining a current estimate, based on work Dr. Person led prior to his retirement (the Wolf Population Study). App. at 100; App. at 15, ¶16;

Doc. 32-13. The agency, however, admitted in the FEIS that "[c]urrent estimates of the wolf population in [Game Management Unit] 2 are lacking." App. at 96.[6]

In the mid-1990s, the Big Thorne project area had sufficient old growth habitat "to support 45-50 wolves, making up approximately [three] separate packs and a portion of a fourth pack." App. at 15, ¶17. By the fall of 2012, the Wolf Population Study reported there were approximately 29 wolves and only two remaining packs. *Id*. at ¶18. By the spring of 2013, the research team "could only account for six to seven wolves . . . ." App. at 16, ¶19. By the spring of 2014, researchers found even fewer wolves. Doc. 32-22 at 3; *see also* Doc. 32-19 at 18 (Forest Service employee cautioning: "Numbers seem to indicate that the population of wolves in the central portion of Prince of Wales Island is approaching zero.").

Dr. Person also participated in the Big Thorne environmental review and expressed serious concerns regarding the project's impacts. *See* App. at 10-13, ¶¶9-13; App. at 28-50; Doc. 32-32. He cautioned that because Big Thorne logging "will remove the most important remaining deer winter habitat . . . the predator-prey relationship between wolves and deer on Prince of Wales is likely to collapse." App. at 21, ¶31; *see also* App. at 10, ¶10. He explained that "wolves

[6] The Prince of Wales Archipelago and Game Management Unit 2 "are essentially the same area with regard to wolves." App. at 9, ¶9.

are already facing the possibility of extinction on Prince of Wales Island," App. at 21, ¶31, and "[t]o prevent this outcome the remaining mid and low elevation deer habitat on Prince of Wales Island needs to be protected." *Id*. at 12, ¶13.b.

The Fish and Wildlife Service subsequently echoed Dr. Person's concerns, concluding the wolf might have to be listed for protection under the ESA. *See* Doc. 32-65 at 1. The Service observed that "past timber harvest has reduced habitat quality and availability" for deer. *Id*. at 4 (citations omitted). It cautioned that a Forest Plan provision that appears to require the Forest Service to maintain habitat sufficient to support deer for wolves and human hunters is not met in many parts of the Tongass and that "[a]dditional logging is predicted to reduce deer habitat capability further in many of those areas, and result in additional areas that fail to meet the standard." *Id*. at 9-10 (citations omitted).

Undaunted these widespread concerns, the Forest Service refused to complete its Wolf Population Study before it approved this record-breaking loss of wolf habitat. Instead the agency simply speculated in the FEIS that "the population on Prince of Wales Island may be lower than in previous years . . .," App. at 96, and reported anecdotal observations that "suggested the wolf population had declined to as few as 150 wolves" in the Prince of Wales Archipelago. App. at 96-97. Indeed the Forest Service's Wildlife Program Leader

for the Tongass cautioned: "The current population may be at an all-time low." Doc. 32-11 at 9 (Comment [BDL11] from Brian Logan).

Following administrative appeals, the Forest Service prepared a supplemental information report to address Dr. Person's concerns. *See* App. at 6-27; Doc. 32-28; *see also* App. at 28-50. Notably, one half of an interagency task force (comprised of the Fish and Wildlife Service members and the Forest Service's Wildlife Program Leader) concluded the Forest Service should obtain a current wolf population estimate before proceeding with logging, explaining the agency should reduce the level of risk by "conserv[ing] . . . important winter habitat for deer." Doc. 32-15 at 14; *see also* Doc. 32-66 at 2 (Fish and Wildlife Service "specifically did not rule . . . out" the possibility that Big Thorne will jeopardize the viability of the wolf).

## III. THE FOREST SERVICE APPROVED THE LARGEST TIMBER SALE IN DECADES BECAUSE IT PERCEIVED A SIGNIFICANT SHORTFALL IN TIMBER SUPPLY.

The reason the Forest Service decided to proceed with such an enormous timber sale in the face of significant threats to wolf populations was that the agency perceived an immediate, critical shortfall of several hundred million board-feet in timber supply.

According to the FEIS, "[t]he purpose and need for the Big Throne Project is to contribute to a long-term supply of economic timber for the timber

industry . . . ." App. at 75. The body of the FEIS incorporated Appendix A to provide "[d]etailed explanations of the rationale for considering timber harvest in the Big Thorne project area and market demand for wood products . . . ." App. at 89; *see* App. at 75, 76, 91, 116-18, 124.

Appendix A included a chart displaying relatively stable cut levels in recent years, averaging 29-30 mmbf per year in the last three, five, and seven years. App. at 105 (Fig. A-1). The FEIS explained that the Forest Service has an objective of maintaining two to three years of timber supply under contract to local mills. *See* App. at 75. Thus, at recent cut levels, the objective would be about 60-90 mmbf. Appendix A disclosed that the volume under contract at the time of publication of the FEIS was 114 mmbf, App. at 114 (Table A 2), well in excess of even the upper end of this range.

Nevertheless, Appendix A concluded that many times more timber was needed to provide a three-year supply, establishing a "2013 Goal" of 429 mmbf under contract. *Id*. (Table A-2). This was more than 14 years of timber at the recent cut levels described above. To meet this goal, the Forest Service would have to supply an additional 315 mmbf under contract—a near quadrupling—to get from the April 2013 level of 114 mmbf to the 2013 goal of 429 mmbf. *Id*.

The principal reason for this gap was that Appendix A relied on market demand projections from a 2006 Forest Service economic report (the Brackley

Report) that had proven significantly higher than actual harvest levels. The following chart displays the Brackley projections compared to actual harvest levels and the projection adopted in Appendix A:




*See* App. at 105 (Fig. A-1), 108 (Table A-1), 109-10 (adopting Scenario 2 for "projected harvest"); App. at 66 (Table 3.22 7).

The adoption of Brackley's 98 mmbf demand projection for 2013 was magnified through the application of agency models and goals. First, it was used as the "projected harvest" for purposes of the agency's inventory control model (the Morse methodology), leading to a goal of offering 143 mmbf in 2013. App. at 109-10; Doc. 32-56 at 1, 2 (line K, Expanded Lumber). The 143 mmbf goal for timber offerings was then tripled to produce the goal of 429 mmbf under contract in 2013. App. at 114 (Table A-2).

Neither the FEIS nor the ROD, nor any other document in the record, analyzes whether the 429 mmbf goal generated by these models was a reasonable target for a timber sale program averaging about 29-30 mmbf per year.

ARGUMENT

The standard for issuance of an injunction pending appeal is the same as that for a preliminary injunction. *See Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100 (9th Cir. 2006), *abrogated on other grounds by Winter v. Natural Res. Def. Council*, 555. U.S. 7 (2008). Generally, a party seeking an injunction must demonstrate the existence of four factors: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm absent the issuance of an injunction, (3) that the balance of equities tips in its favor, and (4) that issuance of an injunction is in the public interest. *Winter*, 555. U.S. at 20. The Ninth Circuit also recognizes that an injunction may still be warranted without a demonstrated likelihood of succeeding on the merits where the moving party raises "serious questions going to the merits" and demonstrates that the "balance of hardships tips sharply" in its favor as long as it also demonstrates "a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). With regard to the harms caused by logging in particular, the Ninth Circuit has consistently concluded that destroying trees that could take hundreds of years to replace warrants

invocation of the court's equitable power. *See, e.g.*, *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 804 (9th Cir. 2005) (injunction pending appeal to halt a timber sale in the Tongass); *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1174 (9th Cir. 2011); *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir. 2006), *abrogated in part on other grounds by Winter*, 555 U.S. 7.

The Court "review[s] the grant of summary judgment de novo, thus reviewing directly the agency's action under the Administrative Procedure Act's (APA) arbitrary and capricious standard." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004), *as amended*, 387 F.3d 968 (9th Cir. 2004).

As explained below, the Big Thorne Appellants are likely to succeed on the merits of their appeal. Additionally, the certainty of irreparable harm caused by old growth logging, the balance of harms and the public interest also favor entry of an injunction. To avoid duplicative briefing, the Big Thorne Appellants incorporate the sections addressing harm and equities from the motion for injunction pending appeal filed in the companion case, *Southeast Alaska Conservation Council v. U.S. Forest Service*, No. 15-35244 (the Forest Plan Appeal). *See* Forest Plan Appeal, Forest Plan Appellants' Emergency Mot. Inj. Pending Appeal, pp. 15-20.

## I. THE BIG THORNE APPELLANTS ARE LIKELY TO SUCCEED ON THE MERITS.

### A. The Forest Service Acted Arbitrarily and Violated NEPA by Failing to Consider the Gap Between the 2006 Market Demand Projections and Actual Cut Levels.

The Forest Service acted arbitrarily by failing to take into account the enormous gap between the 2006 Brackley projections and actual subsequent experience. Where Brackley had projected a steady rise in demand to 98 mmbf by 2013, actual harvest had dropped to 21 mmbf in 2012. *See supra* p. 11. The effect of using 98 mmbf as the "projected harvest" was that the Forest Service adopted a goal of securing 429 mmbf of timber under contract, wildly out of proportion to the recent average harvests of 29-30 mmbf per year. This model-generated analysis established the very purpose of the Big Thorne project and led to the largest timber sale in decades, centered in an area of critical concern to wolf populations. *See supra* pp. 9-10. The failure to consider such an important aspect of the problem is arbitrary. *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Inc. Co.*,, 463 U.S. 29, 43 (1983); *see also Natural Res. Def. Council*, 421 F.3d at 808 ("[I]f the demand for timber was mistakenly exaggerated, it follows that the timber harvest goal may have been given precedence over the competing environmental and recreational goals without justification sufficient to support the agency's balancing of these goals."); *Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914,

923 (D.C. Cir. 1998) (holding arbitrary a rule where the agency "knows that 'key assumptions' underlying the [testing procedure] are wrong").

These errors, because they appear in an environmental impact statement, also violate NEPA by presenting misleading information to the public and to the decision-maker. "Presenting accurate market demand information was necessary to ensure a well-informed and reasoned decision, both of which are procedural requirements under NEPA." *Natural Res. Def. Council*, 421 F.3d at 812. They further violated NEPA by constraining the range of alternatives considered in the EIS. "NEPA requires agencies to 'rigorously explore and objectively evaluate all reasonable alternatives' to a proposed plan of action that has significant environmental effects." *Id.* at 813 (quoting 40 C.F.R. § 1502.14(a)). Had the agency realistically evaluated timber needs, it would have been apparent that much lower volume alternatives, including no timber sale at all, were possible. *See Natural Res. Def. Council*, 421 F.3d at 813-14.

The agency's explanation for adopting the 98 mmbf Brackley "expanded lumber" projection for 2013 ignored important aspects of the problem and was arbitrary. The FEIS's stated that it was "due to the export policy[7] and good overseas markets." App. at 109-10 (footnote added). Even accepting that overseas

[7] The export policy in place since 2009 allows Tongass timber purchasers to export a substantial portion of unprocessed logs. App. at 90.

demand might rise,[8] this cursory explanation failed to take into account that actual timber harvest had fallen far below the Brackley projections and that any future growth would therefore be from a much lower prevailing level of harvest. Where the Brackley scenario adopted by the Forest Service envisioned a rise from 91 to 98 mmbf between 2012 and 2013 after years of steadily increasing demand, App. at 108 (Table A-1), the Forest Service in Big Thorne predicted a near-quintupling leap in harvest from 21 to 98 after years of flat or declining harvests. *See supra* p. 11. The much lower level of prevailing harvest was a critical part of the problem, and the agency's failure to address it was arbitrary. "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168 (1962)).

Of course, there could be many explanations for why actual cutting fell so far short of projected demand, but no such explanations are to be found in the record. That is what makes the decision arbitrary. The district court accepted the government's assertion that "[p]olicy, funding, and litigation . . . have all had an impact on harvest levels," App. at 179, but there is no evidence in the record that

[8] The evidence in the record suggests that exports would not substantially help, because they were more than offset by weakness in domestic markets: "[E]xports are not likely to keep prices from falling," rendering exports merely a "stabilizing factor" in weak markets. Doc. 32-4 at 13.

any policy, any lack of funding, or any litigation had significantly constrained harvest levels in the years leading up to the Big Thorne decision. The Big Thorne Appellants are not aware of any.

The record shows that these factors did not constrain harvest levels, because there was an abundant and growing supply of timber under contract—and therefore immediately available to purchasers—that was not being cut:

| Year | Volume Under Contract (mmbf) | Volume Cut (mmbf) |
|---|---|---|
| 2009 | 84.4 | 28.0 |
| 2010 | 98.4 | 36.0 |
| 2011 | 104.9 | 32.6 |
| 2012 | 130.5 | 20.8 |

Doc. 32-47 at 2; Doc. 32-48 at 2; Doc. 32-51 at 2; Doc. 32-55 at 2; App. at 105. By 2012, the ratio of volume under contract to volume cut was more than 6:1, far in excess of the two to three year supply goal. This fact indicates weak demand. Doc. 32-25 at 35 ("When the volume under contract is rising, it indicates that sale offerings may be running ahead of demand.").

The record is replete with evidence for the most obvious cause of this weak demand, but the Forest Service ignored it completely in the FEIS. Shortly after the Brackley Report was published, the home mortgage market collapsed, causing a crash in housing markets, a global financial crisis, and the most severe recession since the Great Depression. This housing-based crash pummeled markets for wood products worldwide, including specifically in Alaska, and recovery has

occurred only slowly. *See*, *e.g.*, Doc. 32-52 at 13-15; Doc. 32-49; Doc. 32-54; Doc. 32-4 at 12-13; Doc. 32-18; Doc. 68-11 at 1. These well-documented facts likely provide a complete explanation why harvest levels fell so far below the Brackley projections and why timber sale purchasers were not cutting trees despite the steadily growing supply available under contract. Whatever the ultimate conclusion about the impact of the crash might be, to rely on pre-crash projections while ignoring the crash completely, as the FEIS did, was to ignore a critical aspect of the problem and was therefore arbitrary. More fundamentally, whether caused by the global recession or other factors, the wide and growing gap between the Brackley demand projections and actual harvest was a critical part of the problem, and it was arbitrary to ignore it.

B. The Forest Service Violated NEPA Regulations for Addressing Missing Wolf Population Information.

An agency's starting point for any NEPA analysis is to collect and describe baseline data about the environment in which the activity is to occur, because, "[w]ithout establishing . . . baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988). When an agency confronts incomplete or unavailable information as part of the environmental review process, NEPA regulations explain how the agency must address that information in the

environmental impact statement. *See Mont. Wilderness Ass'n v. McAllister*, 666 F.3d 549, 559-561 (9th Cir. 2011). "[T]he agency shall include the information in the environmental impact statement," if the missing information is: (1) "relevant to reasonably foreseeable significant adverse impacts;" (2) "essential to a reasoned choice among alternatives;" and, (3) "the overall costs of obtaining it are not exorbitant." 40 C.F.R § 1502.22(a) (emphasis added); *see also* 51 Fed. Reg. 15618, 15621 (Apr. 25, 1986) (preamble to the rule explaining "[t]he evaluation of impacts under § 1502.22 is an integral part of an EIS and should be treated in the same manner as those impacts normally analyzed in an EIS"). Consistent with the regulation, this Court requires the agency to make these determinations and explain its rationale in the environmental impact statement. *See Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 496-97 (9th Cir. 2014) (explaining the agency must include the analysis "required by § 1502.22(b)" in the EIS); *Montana Wilderness*, 666 F.3d at 554; *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1033 (9th Cir. 2006); *Lands Council v. Powell*, 395 F.3d 1019, 1031-32 (9th Cir. 2004).

Here, the Forest Service admitted in the FEIS that it lacks wolf population information, but the agency failed to comply with the requirements of 40 C.F.R. § 1502.22. The Forest Service conceded that such information is relevant to assessment of the impacts of Big Thorne, as demonstrated by the fact the agency

included wolf population information in the FEIS, albeit from an outdated 1996 estimate. The FEIS, however, never explained whether and why the agency concluded updated wolf information was not essential or too costly and, therefore, could be ignored. *See generally* App. at 96-97. In short, the agency acted unlawfully when it failed to conduct the analysis required by 40 C.F.R § 1502.22 in the FEIS. *See Jewell*, 740 F.3d at 496-97.

## CONCLUSION

For the foregoing reasons, the Court should grant the Big Thorne Appellants' motion and enjoin the Forest Service from allowing Big Thorne old growth logging and new road construction activities pending a decision on the appeal.

Respectfully submitted this 3rd day of April, 2015.

*s/ Holly A. Harris*

Holly A. Harris (AK Bar # 1105017)
Thomas S. Waldo (AK Bar # 9007047)
Eric P. Jorgensen (AK Bar # 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801-1145
T: 907.500.7133
F: 907.463.5891
E: hharris@earthjustice.org

*Attorneys for Plaintiffs-Appellants Southeast Alaska Conservation Council, et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2015, I electronically filed the foregoing BIG THORNE APPELLANTS' EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 (RELIEF NECESSARY BY APRIL 17, 2015), with attachment, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Respectfully submitted this 3rd day of April, 2015.

s/ *Holly A. Harris*
Holly A. Harris
EARTHJUSTICE