Nos. 15-35232, 15-35233, 15-35244

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

**IN RE: BIG THORNE PROJECT AND 2008 TONGASS FOREST PLAN**

---

**SOUTHEAST ALASKA CONSERVATION COUNCIL, ET AL.,**
*Plaintiffs-Appellants*,

*v.*

**UNITED STATES FOREST SERVICE, ET AL.,**
*Defendants-Appellees*,

*and*

**STATE OF ALASKA, ET AL.,**
*Intervenors-Appellees.*

---

On Appeal from the U.S. District Court for the District of Alaska,
Nos. 1:14-CV-13; 1:14-CV-14; 1:14-CV-15 (Hon. Ralph R. Beistline)

---

# FEDERAL DEFENDANTS CONSOLIDATED OPPOSITION TO APPELLANTS' EMERGENCY MOTIONS FOR INJUNCTION PENDING APPEAL

---


JOHN C. CRUDEN
Assistant Attorney General
DAVID B. GLAZER
ALLEN M. BRABENDER
EMILY POLACHEK
U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7415
Washington, DC 20044

## INTRODUCTION

The timber industry in southeast Alaska was once thriving, but many industry jobs have been lost, taking a devastating toll on the region's economy. Unemployment is high. SA 491, 493, 597. Only one mid-sized sawmill remains open and that mill will likely shutter if a reliable supply of timber cannot be secured. Intervenors' Dahlstrom Ex. at 11 ¶ 30. The Tongass National Forest plays a crucial role in supplying timber to the region. One of the National Forest System's original purposes was "to furnish a continuous supply of timber for the use and necessities of citizens of the United States." 16 U.S.C. § 475. Timber production remains an important use for the National Forest System today. 16 U.S.C. § 1604(e). And, specifically, Congress has directed the Forest Service "to provide a supply of timber from the Tongass National Forest which meets the annual market demand for timber from such forest." *Id.* § 539d(a)&(a)(1).

While providing timber to meet market demand, the Forest Service must balance other important considerations such as protecting the forest's wildlife habitat and its scenic and recreational value. *Id.* § 1604(e). The Secretary of Agriculture and the Forest Service have developed a "Transition Strategy" to strike the appropriate balance. Federal Defendants' Supplemental Appendix ("SA") 278; Big Thorne Plaintiffs' Appendix ("BTP App.") 73. Under the Transition Strategy, the Forest Service will seek to provide a reliable timber supply, including from some old-growth

stands, to keep the timber industry alive in the short-term while the industry transitions to a stable supply of young-growth trees. SA 278; BTP App. 73.

Here, various plaintiffs challenge the Big Thorne Project based on their perception that the Project will harm wolves by harvesting old-growth forest on Prince of Wales Island within the Tongass National Forest. But the Forest Service has thoroughly examined the Project's potential impacts on the wolf and determined that the viability of the wolf will be protected. Further, the Project assists the timber industry's transition from old-growth logging by allowing the industry the time and the revenue streams needed to retool for young-growth harvesting. This transition away from old-growth logging likely will help wolf viability over the long-term. While a young-growth market develops, the Forest Service, in an effort to satisfy market demand for timber, must provide a supply of "bridge timber" to sustain jobs in the forest industry during the transition and provide time for the industry to adapt to both the processing and marketing of younger trees. The Project, announced as part of the Transition Strategy, plays an important role in the transition. The Forest Service has worked hard to design a Project that addresses concerns about wildlife impacts while sustaining the jobs that are important to the region. And the Project requires, as a condition for allowing harvest, stewardship actions that, among other things, improve the forest's fish and wildlife habitat and recondition trails and bridges.

As the district court determined, Plaintiffs' legal challenges lack merit and raise no serious questions. Plaintiffs also have not demonstrated, as they must, that they are likely to suffer irreparable harm without an injunction, particularly not from the operations planned for the calendar year. The speculative series of cascading events that must occur before Plaintiffs' alleged harm materializes is unlikely. Moreover, enjoining the Project pending appeal is likely to have a substantial impact on the southeast Alaskan economy. The timber industry may not survive the injunction. Scores of people will lose their jobs in an area where jobs are scarce. The region will be irreparably harmed in countless ways. The use of the "extraordinary remedy" of an injunction pending appeal is not proper here.

## BACKGROUND

The National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 *et seq*., states, among other things, that forest planning is governed by the multiple use management concept of the Multiple-Use Sustained-Yield Act of 1960 (MUSYA), 16 U.S.C. §§ 528-531; 16 U.S.C. §§ 1604(e) & (g). "'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put," *Norton v. S. Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 58 (2004), including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness," 16 U.S.C. § 1604(e). While NFMA and MUSYA require the Forest Service to follow multiple-use principles in general terms,

those statutes impose few, if any, specific directions on how the agency allocates forest resources among competing uses. This Court thus has recognized that multiple-use statutes like NFMA and MUSYA are broad grants of discretion to the Forest Service. *See Perkins v. Bergland*, 608 F.2d 803, 806 (9th Cir. 1979) (multiple-use principles "breathe[] discretion at every pore").

NFMA instructs the Forest Service to implement the statute's multiple-use principles using a two-step approach. At step one, the Forest Service develops what is known as a land and resource management plan (forest plan) for each administrative unit of the National Forest System. 16 U.S.C. § 1604(a). Forest plans guide and constrain forest activities, but usually do not prescribe them. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729 (1998). At step-two, the Forest Service implements a forest plan by proposing, analyzing, and deciding upon site-specific projects or actions, which must be consistent with the applicable forest plan. 16 U.S.C. § 1604(i).

**A. The Tongass Forest Plan ensures wolf population viability.**

NFMA requires that forest plans "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area." 16 U.S.C. § 1604(g)(3)(B). The forest planning regulations at the time of the 1997 Forest Plan revision required forest plan provisions directing that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 36 C.F.R. §§ 219.19; id. § 219.27(a)(6)

(1983). A "viable" population is one that "has the estimated number and distribution of reproductive individuals to insure its continued existence is well distributed in the National Forest." SA 169. Implementing that requirement, the Tongass Forest Plan directs the Forest Service to provide habitat to support viable populations of native and desired species. SA 1–2; Forest-Plan Plaintiffs' Appendix ("FPP App.") 24.

The Tongass Forest Plan provides for the viability of species that depend on old-growth forest by implementing its Old Growth Conservation Strategy. SA 43–45, 173–75. That strategy consists of two components. The first is a habitat reserve network that protects the integrity of old-growth forest; that system establishes Old Growth Reserves (OGRs) of various sizes that are allocated to the Old Growth Habitat Land Use Designation (LUD) or other non-development LUDs. SA 29. The second component is the management of "matrix" lands, *i.e.*, those lands where commercial timber harvest may occur. *Id.* Within matrix lands, ecological components are addressed by "Standards and Guidelines" to provide an array of habitat features for wildlife that include elements associated with old-growth forest. SA 29, 32; *see also* SA 132–33, 140 (discussing this two-prong "coarse filter"/"fine filter" approach).

Thus the 1997 Forest Plan developed a conservation framework for wildlife that employed direction established by the now-superseded 1982 forest planning regulations and integrated several elements into its conservation strategy. The Forest Service reviewed ecosystem recommendations from the available scientific literature

and reports of interagency committees and determined that a reserve system was an appropriate approach to ensure the viability of a wide range of species associated with old-growth forest. SA 16–17, 27–42, 136. The strategy was further strengthened through the addition of species-specific elements, which included Standards and Guidelines for certain individual species. SA 16. Among such species are "management indicator species" ("MIS"), which are "species whose response to land management activities can be used to predict the likely response of other species with similar habitat requirements." SA 18. MIS were chosen from five broad categories of species and used to develop forest plan objectives, analyze how plan alternatives meet those objectives, and further monitor the effect of plan implementation. SA 18, 47. The Forest Service assembled panels of wildlife experts who assessed the population viability of MIS species. SA 19–20. The Sitka black-tailed deer and gray (or Alexander Archipelago) wolf are MIS for the purposes of the Tongass Forest Plan. SA 18. The viability of the Alexander Archipelago wolf was assessed by panels in 1995 and 1997; the results of those assessments are generally consistent. SA 28, 142–43; FPP App. 79.

The 1997 viability assessment panel determined that the 1997 Forest Plan Revision would maintain viable wolf populations far into the future. To reach that conclusion, panelists assigned numerical rankings to the likelihood of several outcomes after 100 years of full Forest Plan implementation under each of the analyzed alternatives, ranging from the condition where the "[h]abitat is of sufficient

quality, distribution, and abundance to allow the species to maintain well distributed, breeding populations" to that where the "[h]abitat conditions result in species extirpation from federal land." SA 26. Of a possible one hundred points being assigned to each scenario, the 1997 panel concluded that the plan-alternative that eventually became the Forest Plan had a mean outcome between 83 and 97 for the "likelihood of maintaining habitat to support viable and well distributed wolf populations," SA 28. The panel concluded that under this alternative "there was virtually no chance of extirpation of the wolf from the Tongass National Forest." FPP App. 79.

The Forest Service followed a similar process for the 2008 Forest Plan Amendment. The 2008 Forest Plan final EIS assigned viability ratings to the alternatives it considered based on the 1995 and 1997 panel assessments, with Alternative 6 adopted as the Selected Alternative. SA 172. Alternative 6 is similar to the Alternative 11 (the Selected Alternative) from the 1997 FEIS. SA 149. Alternative 6 was given a "high rating" (between 81 and 90 points) for the likelihood of maintaining habitat to support viable and well-distributed wolf populations. SA 150.

The Forest Service developed a species-specific wolf-conservation approach based upon the Wolf Conservation Assessment, developed cooperatively by the Alaska Department of Fish and Game ("ADFG"), the Forest Service, and the U.S. Fish and Wildlife Service ("USFWS"). SA 59-110. That assessment identified three

principal management considerations, which have been incorporated in the Forest Plan to promote both near-term and long-term wolf viability: (1) long-term deer habitat capability; (2) habitat reserves; and (3) wolf mortality management. SA 35.

The Forest Service estimates deer habitat capability using the deer model first developed in 1988 and then refined over the years. SA 21–25, 35–36. The model only estimates long-term habitat carrying capacity; it is not meant to project actual deer density. SA 36. Model results are used to compare management alternatives, generally at the biogeographic province scale (which encompasses one or more Wildlife Analysis Areas ("WAAs")). SA 125. Alternatives are evaluated against the deer habitat capability value provided in the Forest Plan Standards and Guidelines, which in 1997 directed the Forest Service to

> [p]rovide sufficient deer habitat capability to first maintain sustainable wolf populations, and then to consider meeting estimated human deer harvest demands. This is generally considered 13 deer per square mile ["/mi.$^2$"] in biogeographic provinces where deer are the primary prey of wolves. Use the most recent version of the interagency deer habitat capability model and field validation of local deer populations to estimate deer habitat capability.

SA 6. The 13 deer per square mile value provided in the 1997 Forest Plan Revision was later adjusted to 17 deer per square mile. SA 38, 173. The 2008 Forest Plan contains a nearly identical Standard and Guideline, which directs the Service to provide

> where possible, sufficient deer habitat capability to first maintain sustainable wolf populations, and then to consider meeting estimated human deer harvest demands. This is generally considered to equate to the habitat capability to support 18 deer per square mile (using habitat capability model outputs) in biogeographic provinces where deer are the primary prey of wolves. Use the most recent version of the interagency deer habitat capability model and field validation of local deer habitat conditions to assess deer habitat, unless alternate analysis tools are developed. Local knowledge of habitat conditions, spatial location of habitat, and other factors need to be considered by the biologist rather than solely relying upon model outputs.

FPP App. 27.

In both versions of the Standard and Guidelines, the deer habitat capability value was never a threshold that established the minimum value projected to ensure wolf population viability, but rather has always been a value that may allow for both wolf predation and human harvest of deer. SA 36–37, 125. Maintaining viability avoids the potential need to list a species under the Endangered Species Act, *see* SA 160, while the Forest Plan sets an additional goal of "[m]aintain[ing] habitat capability sufficient to produce wildlife populations that support the use of wildlife resources for sport, subsistence, and recreational activities," SA 168. A viable population thus may exist even if other uses, such has sport and subsistence hunting, are reduced.

Deer habitat capability modeled in the 1997 Forest Plan FEIS indicated that 34 of the 43 WAAs in the region of some concern for wolf viability in southeast Alaska (that is, portions of Game Management Units 2 and 3) would maintain long-term deer habitat that is likely to support both wolves and current human deer harvest over a

period of 100 years of full Forest Plan implementation. SA 36. After 100 years of Forest Plan implementation, at least 80 percent of the WAAs on Prince of Wales and nearby islands would have estimated deer habitat capability values that meet or exceed 13 deer per square mile. SA 38. Model outputs over that time period also indicated that all 43 WAAs would maintain habitat capable of producing at least 5 deer per square mile, which is the value thought necessary to support equilibrium populations of wolves and deer above viable levels (that is, without considering human harvest of deer). SA 36, 50, 53. When the analysis was repeated using the deer habitat capability value of 17 deer per square mile, 13 of the 25 relevant WAAs were projected to be capable of supporting 17 or more deer per square mile after 100 years of full Forest Plan implementation. SA 38. Thus, the 1997 Forest Plan FEIS disclosed that 24 of 43 WAAs (56 percent) would have sufficient deer habitat capability in 100 years to support sustained harvest of deer by wolves and humans, or a reduction from the earlier projection of 80 percent of WAAs meeting the 13 deer per square mile value. SA 38–39. The FEIS noted, however, that because of the variability in model inputs and uncertainty of how close current deer populations are to carrying capacity, the 17 deer per square mile value and the lower value of 13 deer per square mile would express a range of relative risk, rather than an absolute threshold necessary to support sustained harvest of deer by wolves and humans. SA 39.

As noted above, the deer habitat capability Standard and Guideline is only one component designed to ensure the viability of wolves. A second, important component is the system of habitat reserves, which provide relatively secure wolf populations that in turn "would provide surplus individuals to disperse and support less secure populations in non-reserved lands within the matrix." SA 39. Prince of Wales Island has more than the recommended acreage of habitat reserves. SA 40.

Finally, management of human-caused wolf mortality through the administration of road access and regulation of hunting and trapping provides an additional means for ensuring continued wolf viability. SA 40–41, 141; FPP App. 52. Considering all components of the wolf conservation strategy together, the 1997 Forest Plan FEIS concluded that the Forest Plan would maintain viable populations of wolves in the planning area. SA 42. The FEIS for the 2008 Forest Plan Amendment drew similar conclusions by comparing the alternatives analyzed in that FEIS with comparable ones from the 1997 FEIS. *See* SA 112, 149; FPP App. 31–34, 83. The Forest Service thus determined that the 2008 Forest Plan would maintain wolf population viability. FPP App. 88–89, SA 177.

### B. The Forest Service took a hard look at the Big Thorne Project's impacts on the wolf population.

In 2010, the Forest Service announced a Transition Strategy emphasizing a stewardship approach to support and enhance natural resource-based employment

opportunities and rural development in southeast Alaska, while at the same time providing a source of funding for forest restoration and enhancement projects. BTP App. 73; SA 278. Providing enough timber harvest and stewardship projects for several years' worth of work could allow timber operators the assurance they need to obtain necessary financial backing for retooling their mills to utilize young-growth timber volume, while offering stable employment to southeast Alaska communities throughout the transition period. BTP App. 73; SA 278. The Forest Service designed the Big Thorne Project to contribute to a long-term supply of timber for the timber industry on Prince of Wales Island, while allowing for the transition to a sustainable-forest industry based on young-growth management. BTP App. 75.

The Big Thorne Project authorizes harvest of 6,186 acres of old growth forest and thinning of about 2,299 acres of young growth, together with harvest of utility logs. SA 324, 352. The Project authorizes construction of 46.1 miles of new roads, including 24.1 miles of new temporary roads and 11.9 miles of temporary roads on decommissioned road beds; and authorizes reconstruction of 36.6 miles of existing National Forest System roads. SA 324, 325. The Project also authorizes important environmental rehabilitation work, including young-tree thinning to improve wolf and other wildlife habitat, improvements to fish habitat and fish passage, trail and bridge reconditioning, and other improvements. SA 331–35. The Project will harvest timber

using a variety of prescriptions and various sizes of timber sales offered over multiple years. SA 338–40.

Before approving the Project the Forest Service took a hard look at its potential environmental impacts, including its potential impacts to wolves. The Forest Service first noted that the Project's additive effects were within the range analyzed in the Forest Plan FEIS after full Plan implementation. SA 281. The Forest Service noted that the Project may result in a deer population decline, especially after severe winters, and could reduce the number of deer available to wolves and hunters. SA 288; BTP App. 103d. But the commercial thinning of 2,299 acres of young-growth forest may enhance deer habitat by improving forage by opening the tree canopy and promoting understory development. SA 282, 287; BTP App. 103c, 103d.

The Forest Service noted that past projects have reduced the estimated historic habitat capability value of 19.7 deer per square mile at the biogeographic province scale to the current deer habitat capability of 14.6 deer per square mile. BTP App. 103b. It also noted that the Project would reduce deer habitat capability to 14.4 deer per square mile at Project completion and to 13.9 deer per square mile at stem exclusion (*i.e.*, in 25 years). But the Forest Service noted that these effects and departures from current conditions are within the range disclosed by the 2008 Forest Plan FEIS, to which the Big Thorne FEIS tiers. BTP App. 103a, 103b. Thus, they are consistent with determinations that wolf viability will be maintained.

### C. District court proceedings

After approving the Project, the Forest Service awarded the first contract to Viking Lumber. Plaintiffs filed three lawsuits to stop the Project, contending that the Forest Service used an incorrect methodology for calculating market demand for timber and failed to take a hard look at the Project's impacts on wolves. Plaintiffs alleged that the Forest Service should have prepared a supplemental EIS. Plaintiffs also challenged the Forest Service's NEPA analysis and approval of the 2008 Tongass Forest Plan. The State of Alaska, Viking Lumber and many others intervened to defend the Project and Plan. The district court consolidated the lawsuits. After carefully considering all of the various claims raised by Plaintiffs, the district court granted summary judgment to the Forest Service and Intervenors. BTP App. 177–94.

Viking Lumber planned to begin operations on April 1, 2015. BTP App. 195. On March 26, 2015, Plaintiffs moved for an injunction pending appeal. While concluding that Plaintiffs failed to satisfy the requirements for an injunction pending appeal, the district court granted a 14-day injunction to and including April 15, 2015, to give this Court time to consider Plaintiffs' motions. BTP App. 197. Viking voluntarily agreed to an additional two-day stay to provide this Court more time.

## ARGUMENT

This Court should deny the motion for an injunction pending appeal. Like any injunction, an injunction pending appeal is an extraordinary and drastic remedy that

should be granted sparingly. *Munaf v. Geren*, 553 U.S. 674, 689 (2008). As with a preliminary injunction, to qualify for an injunction pending appeal the movant must show (1) that it is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Stormans, v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009). This Court has allowed a movant to satisfy this standard by demonstrating "serious questions" on the merits, but only if the movant demonstrates a likelihood of irreparable harm and a balance of equities and a public interest that tips *sharply* in its favor. *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). In either case, because an injunction is an extraordinary and drastic remedy, the moving party must make a "clear showing" that it has met all four requirements of the standard. *Winter v. NRDC*, 555 U.S. 7, 22 (2008). Plaintiffs have failed to make a clear showing that they are entitled to this drastic remedy.

The three sets of Plaintiffs (Forest-Plan Plaintiffs, Big Thorne Plaintiffs, and Cascadia Plaintiffs) filed separate emergency motions for an injunction pending appeal, each asserting different merits arguments. Part I responds to each Plaintiff's merits argument in turn, showing that Plaintiffs are unlikely to succeed on the merits of any of their claims. Part II then explains that Plaintiffs have failed to establish a likelihood of irreparable injury, and Part III demonstrates that the balance of equities and the public interest strongly disfavor an injunction pending appeal.

## I. PLAINTIFFS ARE UNLIKELY TO SUCCEED IN THEIR APPEALS AND THEY RAISE NO SERIOUS QUESTIONS ON THE MERITS.

### A. Forest-Plan Plaintiffs plan-level challenge is unlikely to succeed.

Forest-Plan Plaintiffs bring a facial challenge to the Tongass Forest Plan under NEPA and NFMA, without tying that challenge to any project-level decision. Plaintiffs lack standing to bring such a facial challenge. In the context of Forest Service decision-making, it is typically only project-level decisions that authorize ground-disturbing actions that cause the kind of concrete and particularized injuries that are sufficient to confer Article III standing. Put differently, forest plans do not authorize ground-disturbing actions. *Ohio Forestry*, 523 U.S. at 729. Thus, typically only a project that may be challenged in court. *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 658 (9th Cir. 2009). Forest-Plan Plaintiffs, however, do not challenge a project. And they do not specify any concrete harms stemming from the Forest Plan itself. While Forest-Plan Plaintiffs allege harms stemming from the Big Thorne Project and may have had standing to challenge the Project, they have not brought such a challenge. In the context of a project-level challenge, Forest-Plan Plaintiffs could have raised their objections to the Forest Plan "if (but only if) the present Plan" mattered to the Project. *Ohio Forestry*, 523 U.S. at 734. But the proper subject of judicial review would be the Project, and not the Plan. *Ecology Ctr.*, 574 F.3d at 658. Thus, Forest-Plan

Plaintiffs' facial challenge to Plan is unlikely to succeed for threshold, jurisdictional reasons that the district court overlooked before rejecting the merits of the lawsuit.[1]

But Forest-Plan Plaintiffs lawsuit raising NEPA and NFMA arguments lacks merit, even if their claims were justiciable. The Forest Service fully complied with NEPA when adopting the Forest Plan. Forest-Plan Plaintiffs falsely contend (at 13) that "the Forest Service admits … the Forest Plan does not *require* the agency to maintain sufficient habitat in the matrix to prevent jeopardizing wolf viability." While the Forest Service admits the deer habitat capability provision imbues it with some discretion, as this Court has previously noted, the mere existence of that discretion does not mean the Forest Plan is insufficient to prevent jeopardy. *See Tongass Conservation Soc'y v. Forest Serv.*, 385 F. App'x 708, 711 (9th Cir. 2010) ("[T]he Forest Service's approval of a project that would result in less than eighteen deer per square mile was reasonable in light of the conflicting objectives of the Forest Plan"). Forest-Plan Plaintiffs overlook that the habitat capability provision is one part of a multi-part

[1] Forest-Plan Plaintiffs may argue, based on dicta in *Ohio Forestry*, that their NEPA claim is justiciable. But the dicta concerned ripeness and assumed the person bringing the plan-level NEPA challenge had standing. 523 U.S. at 737 ("Hence *a person with standing* who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get *riper*.") (emphasis added)). The problem here is a lack of standing to bring a plan-level challenge, where Plaintiffs have not demonstrated that the Plan, as opposed to the Project, is causing the concrete and particularized harm that are seeking to redress.

strategy. It is the overall strategy, taken as a whole, that prevents jeopardy to the wolf population, not mere adherence to a number in the deer habitat capability provision.

At bottom, however, NEPA only requires disclosure of information to the public and decision-maker. *See Friends of Endangered Species v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985) ("NEPA does not require that we decide whether an EIR is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology."). The Forest Service disclosed that many WAAs are not at the 18 deer per square mile level. FPP App. 64. But Plaintiffs grossly misstate the significance of that disclosure. The deer habitat capability provision does not yield a biological threshold below which wolf population viability is uncertain. Rather, the identified value in the Standard and Guideline (now 18 deer per square mile) provides a means to compare alternatives during a NEPA process and is intended to indicate when habitat is generally sufficient to support deer populations capable of sustaining both wolf *and* human harvest. The value thought necessary to support the equilibrium between deer and wolves is 5 deer per square mile. SA 391. And wolf viability is not imperiled even at a carrying capacity of 5 deer per square mile. SA 28, 36; *see also* SA 49, 53; FPP App. 79; SA 359 (full implementation of the "Tongass Land Management Plan probably do[es] not threaten wolves on Prince of Wales and Kosciusko islands with extinction in the next century unless a catastrophic event such as a disease outbreak occurs").

The Forest Service also disclosed that timber harvest likely would be concentrated in areas of potential wolf habitat. The Forest Plan discloses the effect on deer habitat capability under each alternative in every WAA, and that analysis is designed to evaluate potential consequences for wolves. SA 114–18, 125. The Forest Service explained that wolf populations are principally located on the largest of the islands south of Frederick Sound in southeast Alaska. FPP App. 50–51. The Service identified which WAAs are located on those islands. SA 392. Those disclosures provide all the information that an interested person would need to compare changes to deer habitat capability in each WAA and to understand how wolf populations overlap WAA boundaries.

Finally, the 1997 FEIS disclosed that the largest of the southern islands, where wolf populations are concentrated, are the areas most suitable for economic timber harvest and where the most timber harvest (95 percent) has been scheduled. SA 34. The 2008 FEIS similarly displays the percentage of high quality deer winter range suitable for timber harvest in each WAA. SA 119–22. The 2008 FEIS then explains that logistics in southeast Alaska influence where and when timber is economic to harvest and that the high cost of access and transportation between the timber supply spread throughout the Tongass and processing mills mostly located in the southern portions of the Forest reduces the likelihood that the needs of mill owners will be met where those distances are great. BTP App. 68. Those disclosures allow the public to

understand that timber will be harvested principally in areas where wolves are located. Accordingly, Forest-Plan Plaintiffs are unlikely to prevail in their NEPA arguments.

Forest-Plan Plaintiffs' NFMA arguments are also likely to fail. Again, falling below the 18 deer per square mile value does not raise a wolf viability concern. The 18 deer per square mile value indicates that habitat is generally sufficient to support deer populations capable of sustaining both wolf *and* human harvest. The value thought necessary to support an equilibrium population of wolves above viable levels is 5 deer per square mile. Plaintiffs have not asserted that the Service is failing to manage its lands above the 5 deer per square mile value.

Instead, Forest-Plan Plaintiffs ask (at 5) this Court to reject the 5 deer per square mile value and to adopt the 18 deer per square mile value suggested in the 1996 Wolf Conservation Assessment. Cascadia Plaintiffs join (at 11-13) in this request. But the Wolf Conservation Assessment authors only stated that they could not "suggest a minimum deer population because [they did] not know what would constitute a minimum viable wolf population either demographically or genetically." SA 63. The Forest Service considered that document, along with other studies, when it determined that a minimum deer habitat capability value of 5 deer per square mile would support wolf viability, while higher values would further support wolf predation and human harvest of deer. SA 36, 50, 53. Courts are rightly reluctant to

second-guess the Forest Service's scientists in this complex and technical area. *See Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008).

In any event, the Forest Service's conclusion that the Forest Plan would result in continued viable wolf populations considered all three legs of the wolf conservation strategy -- deer habitat capability, habitat reserves, and regulation of road access and hunting and trapping. SA 42; FPP App. 34, 88–89. Plaintiffs place too much emphasis on the modeled deer habitat capability and too little on the other components of the Forest Service's multi-part strategy. In addition to the deer habitat capability provision, the Forest Plan contains an extensive system of habitat reserves and other areas off limits to development where secure populations of wolves augment populations in matrix areas. SA 39. And management of human-caused wolf mortality, including road management and restrictions on sport and subsistence hunting, further ensure viability where deer habitat capability is estimated to be lower than the value referenced in the Standard and Guideline. SA 128–29; FPP App. 52.

In sum, the Forest Service reasonably concluded the Forest Plan ensures continued viable wolf populations. Even if they can show their claims are justiciable, Forest-Plan Plaintiffs are very unlikely to prevail on their challenge to the district court's thorough and complete rejection of their NFMA challenge.

### B. Cascadia Plaintiffs' NFMA challenge is unlikely to succeed.

Unlike Forest-Plan Plaintiffs, Cascadia Plaintiffs refuse (at 11-15) to recognize that the 18 deer per square mile provision is discretionary, calling the provision instead a "numeric requirement." It isn't a numeric requirement. On its face, the 18 deer per square mile provision provides that the stated-value is "generally considered" to equate to sufficient deer habitat capability to satisfy both wolf and human demands for deer, that the provision is meant to be applied only "where possible," that meeting human demands is not an absolute requirement, and that factors other than modeled deer habitat capability values are relevant. FPP App. 27. If its plain language were not enough, this Court relied on the provision's discretionary nature when upholding a project that would result in less than eighteen deer per square mile. *See Tongass Conservation Soc'y*, 385 F. App'x at 711 ("[T]he Forest Service's approval of a project that would result in less than eighteen deer per square mile was reasonable in light of the conflicting objectives of the Forest Plan").

Like the Forest-Plan Plaintiffs, Cascadia Plaintiffs also misstate the relationship between that provision and wolf population viability. As noted, a failure to meet the modeled value of 18 deer per square mile does not mean that wolf viability is imperiled. SA 391. Instead, the provision indicates whether human deer hunting should be limited. SA 36 ("Deer densities less than 13 [now 18] deer/mile$^2$ but greater than 5 deer/mile$^2$ may indicate that wolves are viable but that human deer harvest

could decline."). Where deer habitat capability is projected to be less than 18 deer per square mile, opportunities for sport hunting may be reduced and followed, if necessary, by restrictions on subsistence harvest. SA 128, 191, 192. The Forest Service works with other federal and state agencies to "provide mechanisms for modifying seasons, bag limits, and hunting/trapping methods and means for purposes of maintaining sustainable populations." SA 186. And, as discussed, maintenance of deer habitat capability is only one component of a multi-part strategy.

There is also no merit to the new suggestion that the Forest Service failed to consider the Standard and Guidelines narrative criterion to use "local knowledge." SA 190. In assessing the wolf population, the Forest Service postulated that wolf numbers may be lower than 1990s levels based on testimony from local trappers, and field observations by state and federal biologists and hunting guides and outfitters. The Forest Service also took into account local wolf harvest trends and data from collaborative population studies conducted with ADFG. FPP App. 52, 62; BTP App. 100. The Forest Service thus followed the Standard and Guideline's narrative criteria.

Cascadia Plaintiffs argue (at 13-14) that the Forest Service failed to consider how legal and illegal hunting has contributed to the wolf's current status, which Cascadia Plaintiffs say is "crashing." But the Island's wolf population is not crashing. SA 626 ¶ 10. And, in any event, as Cascadia Plaintiffs recognize, direct human-caused mortality is the most significant direct threat to the wolf. SA 625-26 ¶ 9. The Forest

Service identified this threat and is pursuing efforts to reduce human-caused wolf mortality. SA 326–27, 330–32, 350–51. Among other efforts, the Forest Service will close roads to alleviate pressures from hunting and trapping. SA 326–27, 330–32, 350–51. The Forest Service thus did not ignore the current status of, or threats to, the area's wolf population. Rather, the Forest Service identified the biggest threat and is working to reduce that threat.

Finally, Cascadia Plaintiffs argue (at 14) that the Forest Service failed to consider the habitat conditions in areas from which wolves might emigrate to WAAs within the Project area, which they believe casts doubt on the Forest Service's conclusion that such areas could support potential source populations and thus that the Service has mistakenly, in their view, relied on the habitat reserve component of the wolf conservation strategy to support areas where modeled deer habitat capability is estimated to be less than 18 deer per square mile. Plaintiffs rely on Dr. Person's declaration (Cascadia Ex. 18), which he submitted to the Forest Service after the administrative process had closed. The Forest Service considered Dr. Person's untimely submission, rejecting his views regarding the habitat conditions of, and wolf population in, the source areas. SA 365–38. Because wolves range widely over a variety of habitats, the Forest Service reasonably concluded that wolves could migrate to the Project area from a variety of other locations. The reliance on the habitat

reserve component of the wolf conservation strategy thus was reasonable. Cascadia Plaintiffs thus are not likely to prevail in their NFMA challenge.

### C. Cascadia Plaintiffs' NEPA challenge is unlikely to succeed.

Cascadia Plaintiffs offer the views of Dr. Person as "dissenting" scientific opinion and insist that the Forest Service improperly failed to consider them when it approved the Project. In arguing that the Forest Service ignored Dr. Person's opinions, Cascadia Plaintiffs conflate views expressed by Dr. Person while he was still employed by ADFG concerning wolves within the Project area and views developed after Dr. Person left ADFG concerning wolves on the whole of Prince of Wales Island. The difference affects if and when the Service must respond.

The first set of Dr. Person's views that were put before the Forest Service did not originate from Dr. Person himself. Rather, Cascadia Plaintiffs raised Dr. Person's views in their comments on the draft Project EIS when arguing that the Forest Service should disregard ADFG's comments because ADFG allegedly had suppressed Dr. Person's views. Cascadia Ex. 7 at 17-25. Cascadia Plaintiffs attached an email chain between ADFG employees as proof of the alleged "state-government conspiracy." Cascadia Ex. 6. Cascadia Plaintiffs now fault the Forest Service for failing to address their conspiracy theory in the final EIS. But it was reasonable for the Forest Service not to address the conspiracy theory or accept the views of one agency scientist within ADFG as creating a scientific disagreement for NEPA purposes.

Disagreements among agency employees are common, particularly among agency scientists. It would be unreasonable to expect federal agencies to respond to every opposing view that an individual scientist might express during internal agency deliberations, particularly when those views are only put before the agency as part of a conspiracy theory. Dr. Person did not speak for ADFG. And it was ADFG's view that mattered. *Cf. Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658-59 (2007) (reviewing court must consider final determination of agency, not views stated by its employees); *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 718 (10th Cir. 2010) (same); *Nat'l Audubon Soc'y. v. Dep't of the Nav*y, 422 F.3d 174, 198-99 (4th Cir. 2005) (same); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998) (same). ADFG did not express a dissenting scientific opinion.

Moreover, Dr. Person's concerns related to the potential adverse impacts the Project may have on watersheds with the Project area. Cascadia Ex. 6 at 1-2; *see also* Person Statement, AR 736_4529 ¶ 32 (describing earlier concerns). While the Forest Service did not refer specifically to Dr. Person, the Service thoroughly addressed watershed impacts in the final EIS. SA 283–84, 287, 288, 291–94; BTP App. 103a–d. And, as the district court recognized and as Cascadia Plaintiffs acknowledge (at 5-6), the Forest Service also cited Dr. Person's published work. BTP App. 175.

The second set of Dr. Person's views were put before the Forest Service only *after* the EIS had been finalized. In that late submission, Dr. Person did not limit his

views to the Project area, as he had done during the internal deliberations at ADFG, but drew broad conclusions about wolf viability on the entirety of Prince of Wales Island. Cascadia Ex. 15. Dr. Person expressed these conclusions in his personal capacity, and not for ADFG. Even though his comments were untimely, Dr. Person's opinion that the wolf population on Prince of Wales Island might collapse prompted the Forest Service to convene the Interagency Wolf Task Force to consider Dr. Person's views. But the Task Force, much like ADFG before it, ultimately did not adopt Dr. Person's conclusions. SA 361. In response to the Task Force's report, the Forest Service drafted a supplemental information report (SIR) explaining why Dr. Person's untimely expressed views raised no significant new circumstances or information relative to environmental concerns that would warrant preparation of a supplemental EIS. SA 365–70. Considering how and when Dr. Person's views were presented to the agency, the Forest Service adequately addressed his concerns and fully complied with its NEPA obligations.

Finally, Cascadia Plaintiffs contend (at 16) that the Forest Service failed to respond to the USFWS's comments on the draft EIS. Cascadia Ex. 8. Not so. As it did with all comments on the draft EIS, the Forest Service grouped the comments of various commenters by topic or subject and responded to the comments by common subject. Using this method, the Forest Service disclosed and responded to each issue raised by the USFWS and others. BTP App. 98–101; SA 317–22 (baseline conditions);

SA 321–22 (road densities); BTP App. 97 (source population); SA 346-47. Cascadia Plaintiffs thus are unlikely to prevail in their NEPA arguments.

### D. Big Thorne Plaintiffs' NEPA challenge is unlikely to succeed.

#### 1. *The Forest Service properly addressed the lack of specific information regarding current wolf populations.*

Because southeast Alaska's thick forest cover makes detecting and observing wolves very difficult, the Forest Service noted that "[c]urrent estimates of the wolf population in [the Project area] are lacking." BTP App. 96. Relying on truncated recitations of the record and the law, Big Thorne Plaintiffs (at 18-20) argue that NEPA requires the Forest Service to conduct field studies to obtain an accurate population count for the wolf. Big Thorne Plaintiffs are wrong.

NEPA regulations establish two avenues for addressing incomplete or unavailable information based on the importance of the missing information to the pending analyses. 40 C.F.R. § 1502.22 (a), (b). Under the first avenue, if the incomplete information "is *essential* to a reasoned choice among alternatives," the agency must include the information in the EIS if "the overall costs of obtaining it are not exorbitant." *Id.* § 1502.22(a) (emphasis added). Here, Big Thorne Plaintiffs identify no evidence that a precise population count of the wolf was "essential" to the

Forest Service's choice between Project alternatives.[2] Instead, acknowledging that land management is "an inexact science," the Service concluded that "the basic data and central relationships are sufficiently well-established in the respective sciences for the deciding official to make a reasoned choice between the alternatives, and to adequately assess and disclose the possible adverse environmental consequences." SA 280; *see also Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 496 (9th Cir. 2014) (upholding an agency's determination that missing information about animal populations was not "essential" to an EIS concerning the proposed lease of federal land for offshore oil and gas development).

Under the second avenue, if, as here, the missing information is not essential to the agency's analysis and the means to obtain the information are unknown,[3] the EIS

[2] In summary judgment briefing, Plaintiffs argued that a single statement taken out of context from the SIR supported their claim that an estimate of the current wolf population on Prince of Wales Island was "critical" information. But that statement, SA 368, merely acknowledged that future work to track wolf population numbers was necessary for the development of a Wolf Habitat Management Plan, as provided for in the 2008 Forest Plan, FPP App. 27. That statement does not support the conclusion that the existing information did not sufficiently allow the Service to reasonably choose from among the alternatives analyzed in the Project EIS.

[3] The EIS notes that "[t]he Tongass National Forest is currently partnering with [the Alaska Department of Fish & Game] to establish protocols for estimating and monitoring wolf population status and trends" in the relevant area. BTP App. 97. As this indicates, at the time the final EIS was prepared, the specific methods for obtaining wolf population data were unknown.

must contain the following: (1) a statement that the information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information; (3) a summary of existing credible evidence that is relevant to the analyses; and (4) the agency's evaluation of such impacts based on theoretical approaches or research methods generally accepted in the scientific community. 40 C.F.R. § 1502.22(b). The final EIS contains all the required information.

First, it is undisputed that the EIS discloses the present lack of specific population data. BTP App. 96. Second, the EIS explains that wolf populations are relevant to the Forest Plan's Standards and Guidelines requiring, where possible, "the provision of sufficient deer habitat capability to first maintain sustainable wolf populations, and then to consider meeting estimated human deer harvest demands." BTP App. 97. Third, after recognizing the lack of current population data, the Forest Service provided credible evidence estimating wolf population. The EIS notes that the population in 1996 was approximately 250 to 350 wolves, but that the population has since decreased such that anecdotal evidence collected by the ADFG suggested a population of 150 wolves in 2010. AA 96. Finally, the Forest Service evaluated the Project's impacts on wolf population viability using the generally-accepted deer habitat capability model. AA 97 (recounting studies that show deer winter habitat to be "a good measure of habitat quality for wolves in southern Southeast Alaska"); *see also McNair*, 537 F.3d at 998–99 (an agency is not required to conduct on-the-ground

population surveys "where both the Forest Service's knowledge of what quality and quantity of habitat is necessary to support the species and the Forest Service's method for measuring the existing amount of that habitat are reasonably reliable and accurate"). The Forest Service thus complied with NEPA. Big Thorne Plaintiffs are unlikely to succeed on the merits of this argument.

*2. The Forest Service properly assessed market demand.*

Big Thorne Plaintiffs asked the district court, just as they now ask this Court (at 14-18), to second-guess the Forest Service's methodology for calculating future timber demand. But the district court recognized its proper role. BTP App. 180. The court properly recognized that the Forest Service "has recognized expertise and discretion in predicting timber demand." *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 746 F.3d 970, 978 (9th Cir. 2014), *reh'g granted*, 765 F.3d 1117. This Court also should defer to that agency expertise and "should not 'substitute [its] judgment for that of the agency.'" *Id.* (quoting *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 513 (2009)). Here, the Forest Service reasonably relied on expert reports to establish timber-demand projections for the Project. BTP App. 89; SA 296–316. The Court need not "determine whether the [Forest Service] chose the *best* method for predicting demand so long as the method is neither arbitrary nor capricious." *Kake*, 746 F.3d at 978–79.

As explained in Appendix A of the Big Thorne EIS, the Forest Service used market projections calculated in the Brackley Report, which was last updated in 2008.

SA 303–16; SA 193–232 (2006 Brackley Report); SA 233–276 (2008 Brackley Report). Big Thorne Plaintiffs assert that the Forest Service's use of the timber demand projections in the Brackley Report was improper because past projections of market demand exceeded the amount of timber actually harvested. But Plaintiffs' argument presents a false comparison that conflates the separate measures of market demand and actual harvest. Contrary to Plaintiffs' assertions, the Forest Service explained the difference between demand projections and actual harvest, and reasonably concluded that the Brackley Report's Expanded Lumber projection was the proper measure of future timber demand.

First, the Forest Service explained the differences between market demand estimates and actual harvest levels at numerous points in the record. In the 2008 Forest Plan, the Forest Service explained that recent harvest levels on the Tongass are not a good basis for estimating market demand because recent harvests experienced an imperfect market with supply limitations. SA 157; *see also* SA 356–57. The Forest Service noted specific constraints on past harvests: "appeals and litigation, difficulties in preparing sales with positive appraisals, legislation unique to the Tongass . . ., and funding levels." SA 157. The Forest Service went on to explain that new policies should lead to more positive sale appraisals, as well as "other developments such as biofuels that could substantially increase future demand, even if the current model cannot quantify such effects." *Id.*

Similarly, the Big Thorne Project EIS explains how appeals and litigation affect harvest levels. BTP App. 114. If a project is challenged in an administrative appeal or lawsuit, "the Forest Service and potential purchasers are often reluctant to enter into a contract where the outcome is uncertain." *Id.* Lengthy litigation thus serves as an obstacle to reliable supplies. *Id.*

Given the recent obstacles to timber harvesting, it was reasonable for the Forest Service to rely on the Brackley Report, rather than actual harvest amounts, to estimate future market demand. The Brackley Report is a long-term projection of timber demand specifically designed "to avoid emphasis on short-term cycles." SA 154. This Court has upheld an agency's use of higher market projections that were based on historical data even though timber demand had decreased in recent years. *Organized Village of Kake*, 746 F.3d at 978–79 (finding that it was "certainly reasonable for the agency to determine that a higher market estimate from twenty-two years of data is preferable to a lower market estimate based upon demand in a short cyclical downturn"). The Brackley Report used historical data spanning forty years (1965–2004) as a basis for a twenty-year projection from 2005 to 2025. SA 154. Based on that data, the Brackley Report stated that export and domestic markets in the continental 48 states are "large enough to absorb essentially unlimited volumes of round logs" from Alaska. SA 197. In other words, a market would exist to purchase more timber from the Tongass than has been actually harvested in recent years, if that

timber supply were not limited by short-term factors such as litigation and funding, policy, or other constraints. Accordingly, Big Thorne Plaintiffs' conflation of estimated timber demand with actual harvest does not render the Forest Service's decision arbitrary or capricious.

Big Thorne Plaintiffs contend (at 17–18) that the Forest Service's use of the Brackley Report's Expanded Lumber projection was arbitrary because the agency "completely ignored" the collapse of the housing market and its implications on the timber industry. This argument ignores the many factors involved in estimating demand. Even though earlier in the Project planning process the Forest Service had used the Limited Lumber scenario, the Forest Service ultimately used the Brackley Report's Expanded Lumber projection for calculating annual demand for Tongass timber because of export policy and strong overseas markets, in addition to slowly recovering domestic markets. The annual demand model (the Morse method) uses the long-term demand estimates for end-use markets from Brackley as an input, and has other inputs such a volume under contract that account for current market conditions. BTP App. 108–09; SA 353–54.

The Forest Service's determination to use the Expanded Lumber scenario, even after the 2008 financial crisis and housing market downturn, was grounded in facts and agency expertise. SA 353–54 (explaining the factors that led to a net increase in timber demand between 2012 and 2013). The Forest Service's Regional Economist, in

her professional judgment, determined that the current market conditions made using the Brackley Report's Expanded Lumber estimate reasonable. *Id.* The Forest Service's Appeal Deciding Officer, in addressing whether the Big Thorne FEIS had relied on accurate market demand scenarios, also reached the same conclusion that demand was expected to rise. SA 357. Specifically, the Forest Service stated:

> Alaskan wood products markets are closely tied to North America and the Pacific Rim, and have been deeply affected by tight credit and low cost margin issues. However, rapid development of wood-biomass energy could open up new markets for small and lower quality wood. Domestic housing starts are once again on the rise, and domestic lumber prices are recovering. As wood products markets improve, remaining wood manufacturing facilities will be well situated to take advantage of rebounding demand for lumber. Long-term demand for Alaska wood products is expected to increase.

*Id.*; *see also Kake*, 746 F.3d at 979 (stating that agencies need not be "constant pessimists," but can instead make decisions "based upon the opinion that the economy will improve and demand for timber will rise"). Thus, using the Expanded Lumber scenario was appropriate under the circumstances.

Finally, Big Thorne Plaintiffs ignore the fact that estimates of timber demand require long-term market forecasting because "timber sales take years to process" and "must be planned and made available in advance of projected needs." SA 155. When making demand estimates for the long term, the effect of underestimating timber demand is much more serious than overestimating demand. SA 357. If demand is

understated, mills may close for lack of adequate timber supply. *Id.* If, however, the agency prepares for more demand than occurs, the excess timber will not be sold. *Id.*

Big Thorne Plaintiffs repeatedly cite (at 13-15) *Natural Resources Defense Council v. U.S. Forest Service* ("*NRDC*"), 421 F.3d 797 (9th Cir. 2005), in which this Court reversed the Forest Service's revision of the Tongass Forest Plan due to inaccurate market demand projections. But *NRDC* is readily distinguishable. In that case, the Forest Service relied on a 1997 market demand report, 421 F.3d at 801, which preceded and served as the basis for the Brackley Report, *see* SA 198. But the Forest Service admittedly misinterpreted the projection numbers and mistakenly doubled the projected timber demand. 421 F.3d at 802. Because the parties agreed that the market demand projection was incorrect, this Court was asked to decide only whether the erroneous market projection was significant to the planning process in that case. *Id.* at 804, 807-10. There is no similar scenario before this Court.

In sum, Big Thorne Plaintiffs conflate the market demand projections in the Brackley Report and actual harvest amounts. The Forest Service adequately explained these different concepts, the reasons that actual harvest amounts recently fell below demand projections, and the factors supporting its use of the Expanded Lumber scenario. Because the Forest Service's decision was reasonable and entitled to deference, Big Thorne Plaintiffs are unlikely to succeed on the merits of this claim.

## II. PLAINTIFFS FAIL TO DEMONSTRATE A LIKELIHOOD OF IRREPARABLE HARM.

A demonstration of a likelihood of irreparable harm is the irreducible minimum showing necessary for an injunction. *Winter*, 555 U.S. at 20; *Cotrell*, 632 F.3d at 1134-35. Plaintiffs have not made such a showing. There is no presumption of irreparable harm. *Flexible Lifeline Sys. v. Precision Lift*, 654 F.3d 989, 997-98 (9th Cir. 2011). This is true even in environmental cases: "No such thumb on the scales is warranted." *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). This Court recognizes that, even though some environmental impacts may be "permanent or at least of long duration," that "does not mean that 'any potential environmental injury' warrants an injunction." *Cottrell*, 632 F.3d at 1135 (quoting *McNai*r, 537 F.3d at 1004). Even with respect to the timber harvesting activities at issue here, courts have recognized that "timber cutting is not inherently damaging to forests and irreparable harm does not automatically arise from all environmental impacts caused by logging." *Friends of the Wild Swan v. Christiansen*, 955 F. Supp. 2d 1197, 1202 (D. Mont. 2013) (citing *Earth Island Inst. v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010)), *aff'd sub nom.,* 767 F.3d 936 (9th Cir. 2014)).

Moreover, the relevant inquiry is not injury to the environment, but rather injury to the movant. *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181, (2000). Plaintiffs must detail how the Project is likely to irreparably injure them in an individualized way. *Id.* Generalized claims of possible injury are insufficient. *Winter*,

555 U.S. at 22. Allegations of likely injury must be specific with respect to "particular site[s]." *Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009). As the Supreme Court has said when discussing the proof of injury necessary to confer Article III standing, the specificity requirement "is assuredly not satisfied by averments which state that ... [an individual] uses unspecified portions of an immense tract of territory." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990); *see also Heartwood v. Agpaoa*, 628 F.3d 261, 267-68 (6th Cir. 2010). Considering that to obtain an injunction Plaintiffs must not only show injury, but irreparable injury, sufficient specificity is even more important.

Here, Plaintiffs cite various declarations developed to demonstrate their Article III standing that they allege show that the Project will adversely affect their use and enjoyment of the Project area. Even assuming these declarations suffice to demonstrate their Article III standing, Plaintiffs' declarations are wholly insufficient to demonstrate that they will suffer irreparable harm from Project operations, particularly those operations planned for 2015. Most of the declarations are facially insufficient because they do not specify which areas the declarants use. *Nat'l Wildlife Fed'n*, 497 U.S. at 889; *Heartwood*, 628 F.3d at 267-68. Those declarations that do identify specific areas do not show that the operations currently planned for the calendar year 2015 would cause them any irreparably harm. The areas in which Viking states that it will be working are not those areas that Plaintiffs' declarants have specifically identified. SA 627-28 ¶¶ 13-14. In fact, some of the areas that Plaintiffs say

they use are as far as 50 miles from Viking's planned 2015 activities. SA 627-28 ¶ 13. For that reason, it is not "likely" that activities planned for 2015 will irreparably harm Plaintiffs. Thus, because this appeal will likely be resolved before any harm threatens Plaintiffs' stated interests, there is no basis for an injunction pending appeal.

Recognizing the problem, Cascadia Plaintiffs have submitted a new declaration from Mr. Joseph Merhkens. Mr. Merhkens states that he intends to take a family vacation to the area where activities will occur in 2015 and is worried about logging traffic and visual impacts. (Exh. 31). But possible harms to Mr. Merhkens' recently-developed vacation plans fail in comparison to the irreparable harm that will befall the communities of southeast Alaska if Project activities are enjoined. *See* Intervenors Joint Opp. at 30-38. Plaintiffs have had more than a sufficient opportunity to explain and specify how Project operations planned for 2015 will irreparably harm them, but have not satisfied their burden.

Even if Plaintiffs had interests in the areas where Project operations will occur in 2015, the vast majority of Plaintiffs' substantive claims relate to the wolf. But Project-related impacts to the wolf are not likely to occur. Any harm to the wolf depends on a series of cascading events occurring that are simply not "likely" to occur together, particularly in the time frame necessary for this Court to decide this appeal: (1) one or more severe winters; (2) a corresponding reduction in the deer population; and (3) the failure of the ADFG to properly manage human deer and wolf harvest. SA

622-26 ¶¶ 2, 9-10; Internvenors' Ex. Dkt. 11-5 at 8-16 (Exh. 1 from Cole Declaration). The chance of those events happening together and before this Court decides the appeal is not likely. And the Project includes components designed to benefit the wolf population, such as enhancing deer habitat and managing road access. Those benefits will not be realized if the Court enjoins the Project.

In any event, Cascadia Plaintiffs (at 2) are wrong that the Project is the "final straw" for the wolf on Prince of Wales Island. The Island has a very significant and viable wolf population. SA 622-23 ¶ 2. Moreover, it is not the Project, but the human-caused mortality from hunting and trapping that "is the primary and most direct threat to the wolves on [Prince of Wales Island]." SA 366. The Forest Service and the State of Alaska are taking action to reduce that mortality by beginning to reduce harvest limits, increasing law enforcement, and closing roads that allow hunters to access wolf habitat. SA 326–27, 330–32, 350–51, 622 ¶ 2, 626 ¶ 9. Plaintiffs have not demonstrated that enjoining this Project is necessary, where regulatory limits on the harvest of wolves are the most effective means of protecting wolves on Prince of Wales Island. Plaintiffs thus have failed to demonstrate why an injunction is necessary to prevent the harms, let alone irreparable harms, that relate to the vast majority of their substantive claims. Because Plaintiffs have failed to demonstrate a likelihood of irreparable harm during the period in which this Court will likely resolve this appeal, their motions should be denied.

## III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY DISFAVOR AN INJUNCTION PENDING APPEAL.

An injunction will irreparably harm southeast Alaska's businesses and residents and the Forest Service, and therefore should be denied. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). The public consequences of entering an injunction here are immense. Intervenors and their declarants, including the State of Alaska, Viking Lumber and a diverse group of municipalities and businesses, detail those consequences in their submissions. *See* Intervenors' Joint Opp. at 30-38. In short, Viking Lumber, the region's last remaining saw mill of significant size, would shutter, perhaps permanently. More than a hundred jobs would be lost directly, and countless jobs would be lost indirectly in various industries as a result of Viking's closure. Southeast Alaska already has high unemployment and an injunction would exacerbate the situation. Entering the requested injunction would not be in the public interest.

Plaintiffs dismiss Viking's and the public's harm, claiming it is only financial. But the harm is more than just financial. *Id.* And, regardless, this Court has made clear that economic impacts to local communities and to timber companies are appropriately considered as part of the balancing of equities when groups seek to enjoin timber harvest. *McNair*, 537 F.3d at 1005 (district court did not err in

concluding that the balance of harms did not tip in organization's favor where a timber project would "further the public's interest in aiding the struggling local economy and preventing job loss"); *Earth Island Inst. v. Carlton*, 626 F.3d at 475 (same). Moreover, without a sufficient security bond pursuant to Fed. R. Civ. P. 65(c), which Plaintiffs have resisted,[4] the financial harm that Viking will suffer from an injunction is irreparable. And a security bond may itself be insufficient if Viking goes out of business, which is a real possibility. Intervenors' Dahlstrom Ex. at 11 ¶ 30.

Plaintiffs speculate that there is sufficient timber from Alcan Forest Products and the State of Alaska to keep Viking in business through 2016. But the Alaska State Forester, the Tongass National Forest Supervisor, and Viking have submitted declarations explaining why Plaintiffs' speculation is misguided. Intervenors' Dahlstrom Ex. at 6-11; SA 616-19; SA 625 ¶ 8. Viking is unaware of any other source of timber that will prevent the likely permanent close of its mill if this Court granted an injunction. Intervenors' Dahlstrom Ex. at 11 ¶ 30.

---

[4] Rule 65(c) of the Federal Rules of Civil Procedure authorizes courts to grant a preliminary injunction "only if" the movant posts a bond that is sufficient to pay the costs and damages sustained by any party found to have been wrongly enjoined. Fed. R. Civ. P. 65(c). As Intervenors argued below, Plaintiffs are not exempt from this requirement. *See Save Our Sonoran v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005); *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 457-61 (7th Cir. 2010).

Recognizing the injunction's likely dire consequences for the Viking and the public, Plaintiffs assert that they only seek to enjoin old-growth logging and road construction. But such an injunction's impacts would be much greater than Plaintiffs imply. While the requested injunction ostensibly would allow a second-growth harvest, a second-growth harvest is not part of current operations and would need to be field-prepared, appraised, advertised, and sold, before such timber could be made commercially available. SA 623 ¶ 4. Beyond that, old-growth timber would need to be processed along with second-growth timber to make the contract profitable for the operator. *Id.* And if any needed road construction or reconstruction is enjoined, the operator would not be able to harvest even second-growth. *Id.*

The stewardship components of the Project require the performance of important environmental rehabilitation work, including young-tree thinning to improve wolf and other wildlife habitat, improvements to fish habitat and fish passage, trail and bridge reconditioning, and other improvements. The Project would allow the Forest Service to conduct other restoration work as well. SA 626 ¶ 10. Although Plaintiffs may not seek to enjoin such activities, that work is dependent upon the timber sale component of Viking's contract and would be effectively enjoined if timber harvest is halted. SA 625 ¶ 8. When all those lost benefits are weighed against Plaintiffs' allegations of possible harm, the balance clearly tips sharply against enjoining the Project. *See McNair*, 537 F.3d at 1004-05.

Finally, in addition to the Forest Service losing the benefits of the stewardship work, an injunction would strike a significant blow to its Transition Strategy. As noted, this Project is an important part of the Strategy. The Strategy transitions the timber industry away from old-growth logging by allowing the industry the time and the revenue streams needed to retool for young-growth harvesting. While a young-growth market develops, the Strategy, in an effort to satisfy market demand for timber, calls for supply of "bridge timber" to sustain jobs in the forest industry during the transition and provide time for the industry to adapt to both the processing and marketing of younger trees. The Transition Strategy thus seeks to balance the same important, yet competing, interests identified to the Court by the various parties. But the Strategy balances those interests in an equitable manner that does not inflict the substantial harms that the requested injunction would inflict. In sum, the balance of equities and public interest strongly disfavor an injunction pending appeal. Thus, under any formulation of the injunction test,[5] the injunction should be denied.

[5] The alternative "serious questions" test is questionable in light of *Winter*'s statement that preliminary injunctive relief requires a showing of *likely* success on the merits. *Winter*, 555 U.S.at 20. Assuming that alternative test is still viable, the "serious questions" test makes up for the decreased showing on the merits by increasing the showing required on the equitable factors. Here, Plaintiffs raise no serious questions on the merits. Even if they had, because of their lack of irreparable harm and the significant and irreparable harms an injunction is likely to cause the Forest Service, Intervenors, and the public, Plaintiffs have not met the increased showing required of them under the remaining factors of the alternative "serious questions" test.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motions should be denied.

Respectfully submitted,

JOHN C. CRUDEN
Assistant Attorney General

/s/ *Allen M. Brabender*
DAVID B. GLAZER
EMILY POLACHEK
ALLEN M. BRABENDER
U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7415
Washington, DC 20044
(202) 514-5316
allen.brabender@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on April 9, 2015. I filed the foregoing document and its accompanying excerpts of record using the Court's CM/ECF system. All participants in this case are registered to receive service with that system and will receive a copy of these documents upon their filing.

/s/ *Allen M. Brabender*
Allen M. Brabender