**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| In re:<br><br>BIG THORNE PROJECT AND 2008 TONGASS FOREST PLAN | No. 15-35232 |
| SOUTHEAST ALASKA CONSERVATION COUNCIL, *et al.*,<br><br>*Plaintiffs-Appellants*,<br><br>CASCADIA WILDLANDS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES FOREST SERVICE, *et al.*,<br><br>*Defendants-Appellees*,<br><br>and<br><br>STATE OF ALASKA, *et al.*,<br><br>*Intervenor Defendants- Appellees*. | |

# BIG THORNE APPELLANTS' REPLY TO EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

The Big Thorne Appellants submit this reply in support of their motion for an injunction pending appeal of Big Thorne.

## I. THE FOREST SERVICE ARBITRARILY FAILED TO ADDRESS THE GAP BETWEEN PROJECTED DEMAND AND HARVEST.

Appellees do not dispute the central elements of the timber volume claim: that the Forest Service did not address the wide and growing gap between the pre-crash Brackley projections and actual subsequent harvest levels, leading to a 2013 volume goal of 429 mmbf, 14 times recent harvest levels. Appellees accuse the Big Thorne Appellants of conflating harvest with demand by suggesting merely that the Forest Service should have considered this growing gap. Doc. 14-1 (Fed. Br.) at 33; Doc. 12-1 (Int. Br.) at 7.[1] The Big Thorne Appellants did not conflate the two. Actual harvest, while obviously a separate measure from demand, nevertheless provided relevant evidence that demand may in fact have changed. This was particularly true given that markets for wood products had collapsed after the Brackley report due to an historic and unforeseen global financial crisis. To neglect both the shortfall in actual harvest and the substantial market changes subsequent to the Brackley projections was to ignore critical parts of the problem, rendering the decision arbitrary.

[1] The "Doc." citations used herein refer to the appellate docket in this appeal, No. 15-35232.

Appellees insist that it was only non-market factors, particularly litigation, that caused the gap between harvest and pre-crash demand projections. This contention lacks record support and is untrue, as revealed in several ways.

First, if there had been injunctions (or other factors) that had significantly constrained the timber supply subsequent to the Brackley projections, one would expect Appellees to identify them prominently and specifically, with citations to the specific lawsuits or policies that caused the problem. The failure to do so anywhere in the record or in the briefs speaks volumes: they do not exist.

Second, the Appellees cite two documents on this point, but neither supports the contention. First, they cite the 2008 forest plan amendment EIS. Int. Br. at 8 (citing Ex. E); Fed. Br. at 33 (citing SA 157). The flaw in this should be obvious: it was a document published in January 2008, roughly contemporaneous with Brackley. Any shortfalls caused by lawsuits before that time were necessarily pre-Brackley. Federal Appellees also cite a discussion in the Big Thorne FEIS noting that it is possible for litigation to constrain timber supply. Fed. Br. at 34 (citing BTP App. 114). This hypothetical proposition is obviously true, but what is conspicuously absent is any assertion that any lawsuits (or anything else) had actually constrained the timber supply subsequent to the Brackley projections.

Third, Forest Service records show that the timber supply under contract in the years leading up to Big Thorne was steadily growing while harvest levels were

flat or declining, irrefutable evidence that it was demand, not supply, that was faltering. *See* Doc. 10-1 at 17. The Big Thorne Appellants emphasized this in their motion, *id.*, and neither set of Appellees has made any attempt to rebut it.

Fourth, Appellees ignore the most obvious and likely cause of the shortfall in harvest levels, *i.e.*, the global recession. Even if there had been non-market constraints on supply, a proposition finding no support in the record, it would still be arbitrary to neglect an obvious market-related factor. The impact of the financial collapse on wood product markets is well documented in the record but ignored in the Big Thorne harvest projections. *See* Doc. 10-1 at 17-18.

Appellees urge the Court to defer to agency expertise, citing documents from the Regional Economist and the Appeal Deciding Officer identifying factors that could lead to increasing demand. Fed. Br. at 35-36 (citing SA 353-54, 357). Even assuming all the factors identified in those documents were true, and even accepting that demand could be expected to increase, both documents suffer from the same flaw: they fail to address the fact that any future growth would be from a level of harvest that had fallen far below the Brackley projections. *See* Doc. 10-1 at 16. Deference ends when an agency has failed to consider an important aspect of the problem. *Lands Council v. McNair*, 537 F.3d 981, 987, 993 (9th Cir. 2008) (en banc); *Brower v. Evans*, 257 F.3d 1058, 1065 (9th Cir. 2001).

Importantly, the claim here does not allege flaws in either the Brackley report or the Morse methodology. Brackley may have made good projections based on information known at the time, and the Morse methodology, using sound harvest projections, may be a good way of setting yearly volume goals. The arbitrary action here was the continued reliance on Brackley without taking into account significant new facts that occurred after the report, *i.e.*, the collapse in wood product markets and the growing gap between the projections and actual harvest.[2]

## II. THE FOREST SERVICE DID NOT COMPLY WITH 40 C.F.R § 1502.22.

There is no dispute in this case that the Forest Service acknowledged in the FEIS that the current wolf population estimate is missing information. *See* Fed. Br. at 29 (Federal Appellees conceding the agency lacked a current wolf population estimate). There also is no dispute that the FEIS did not include the analysis required by Section 1502.22(a), by not evaluating whether the information was essential to the agency's choice of alternatives nor explaining that the means

---

[2] Appellees at points in their briefs seem to call into question the purposes and goals of the Big Thorne FEIS. Intervenors falsely assert that the purpose was to provide a large ten-year contract. Int. Br. at 6-7. The Forest Service first started work on the project in 2008 with that purpose in mind, App. 72, but later changed the purpose to be more flexible. App. 73. Federal Appellees assert that the project was needed to secure financing for timber operators to retool their mills, but no mention of this purpose is made in the FEIS; the citations do not support the assertion. Fed. Br. at 13 (citing App. 73 and SA 278). The volume goal for the project was determined exclusively in Appendix A. *See* Doc. 10-1 at 9-10. That flawed analysis thus infected the entire project.

of obtaining the information were unknown nor that the costs of obtaining the information are exorbitant. *See Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 496 (9th Cir. 2014); *see also* App. 96-97. For this reason, Federal Appellees' reliance on *Jewell*, Fed. Br. at 30, is misplaced given the agency in that case, as required, included the analysis and explanation in the EIS. *See* 740 F.3d at 496. In contrast, in this case, the Forest Service violated NEPA's requirements and acted unlawfully when it failed to include that analysis in the FEIS.

Most of Federal Appellees' response is irrelevant—it describes how the Forest Service complied with the provisions of Section 1502.22 that would have applied had the agency properly concluded the information was not essential. Fed. Br. at 30-32. The only responsive argument improperly shifts the obligations imposed by the regulation from the Forest Service to the Big Thorne Appellants. *See id*. at 29-30 ("Big Thorne Plaintiffs identify no evidence that a precise population count of the wolf was 'essential'"). Shifting the burden "conflicts with the plain language of § 1502.22, which requires the agency to make the findings." *Native Vill. of Point Hope v. Salazar*, 730 F. Supp. 2d 1009, 1018 (D. Alaska 2010) (concluding the agency's failure to follow § 1502.22 was arbitrary and warranted remand).

It is, nevertheless, worth noting that there were several obvious reasons the agency should have included the information. First, the Forest Service's own

wildlife expert and the Fish and Wildlife experts told the Forest Service that it should obtain a current wolf population estimate before moving ahead with projects like Big Thorne. *See* Doc. 10-1 at 9. Second, NFMA requires the Forest Service to manage habitat in such a way as to maintain "well distributed" wolf populations on the Tongass. *See* Fed. Br. at 5-6. Wolf experts have told the agency that logging too much of Prince of Wales Island compromises the agency's ability to meet NFMA's well distributed requirement. FA 2.[3] Here, Forest Service staff has acknowledged that the population on Prince of Wales is already approaching zero. *See* Doc. 10-1 at 7. Third, the Big Thorne decision approved both new roads and road reconstruction, App. 120, but wolf experts have cautioned the agency that "successful implementation" of the Forest Plan's provisions governing roads "require[s] knowledge of [wolf] population size . . . ." FA 2-3.

In short, despite the severity and consistency of these concerns, the Forest Service acted unlawfully when it approved logging more wolf habitat from the Tongass than at any time in the last twenty years without complying with the requirements of 40 C.F.R. § 1502.22.

---

[3] The "FA" citations refer to the Further Appendix filed today in this appeal, No. 15-35232.

## III. CLEAR-CUTTING THOUSANDS OF ACRES OF OLD GROWTH FOREST CONSTITUTES IRREPARABLE HARM.

Federal Appellees argue the Forest Plan and Big Thorne Appellants failed to provide evidence of irreparable harm, but in so doing they cherry-pick isolated references, *see* Fed. Br. at 39-40, and ignore the declarations that specifically describe both individual and commercial use and enjoyment of the affected area, including the Thorne River drainage and areas near Thorne Bay. For example, Bob Claus has "used the project area for recreation several times a month since 1994," specifically explaining he "enjoy[s] the easy access to the Thorne River and its tributaries for fishing, canoeing, and wildlife viewing . . . ." FP App. 143-44;[4] FP App. 160 (describing use of "the entire Thorne River ecosystem"); FP App. 4-5 (seeking to "protect[] her recreational use and enjoyment of the project areas around Thorne Bay . . . ."). Thus, the Big Thorne Appellants and Forest Plan Appellants' members use the entire Big Thorne project area, including places immediately adjacent to the logging scheduled to begin this Saturday.

## IV. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION.

In contrast to the irreparable harm caused by old growth logging, any adverse impacts from an injunction pending appeal would be minor. The

---

[4] Rather than file duplicative appendix materials, Section III of this brief refers to the appendix filed in the Forest Plan Appeal (No. 15-35244), Doc. 3-2, and identifies the documents as "FP App."

Appellees attempt to paint a picture in which a temporary injunction of a single timber sale would cause severe economic consequences, but the facts do not support this. The balance of equities and the public interest favor an injunction to prevent the permanent loss of old growth forest while the appeal is pending.

The timber industry provides less than one percent of employment in Southeast Alaska. *See* Forest Plan Appeal, No. 15-35244, Doc. 3-1 at 19-20. In the Big Thorne FEIS, the Forest Service determined that total direct Tongass-related timber employment was only 109 jobs. FP App. 125 (Table TSE-1). Within this small industry, Viking is only one of several mills, albeit the biggest. FP App. 127. Another substantial portion of Tongass logs are exported with no local processing. FP App. 129.

Appellees' entire claim of economic harm is tied to Viking, but the impacts even to that mill are exaggerated. The owner claims to process 21.6 mmbf per year, Doc. 12-2 at 7 ¶ 19 (1800 mbf/month), but Forest Service surveys show that the Viking mill has sawn only about half that amount in the most recent years for which records are available. *See* FP App. 127 (10 mmbf in 2011); FA 4 (11.3 mmbf in 2012).

The owner further claims that of the many timber sales potentially available, only Big Thorne can meet his needs. Doc. 12-2 at 7-11 ¶¶ 20-30. Even this long explanation ignores potential logs Viking could potentially purchase, such as those

from two timber sales currently active on Alaska Mental Health Trust lands. SA 620 ¶ 17. For example, last fall Viking similarly predicted it would run out of logs, but then succeeded in procuring a state timber sale. SA 608 ¶ 14. At worst, the Viking mill faces only a short-term problem, with large new offerings planned from both state and federal lands in the coming months. *See* SA 617 ¶ 8, SA 619 ¶ 13, 624 ¶6.

If Appellees are correct that the Forest Service and the State of Alaska have failed to offer any timber sales other than Big Thorne to meet Viking's narrow specifications for tree size and species mix, *see* Doc. 12-2 at 10-11 (listing multiple sales under contract rejected by Viking), the rest of the public should not be held hostage to this situation. Appellants and other members of the public should not have to endure the permanent loss this summer of hundreds of acres of irreplaceable old growth forest, in an area already put at significant habitat risk from past clear-cutting, especially in light of the limited economic contribution of the single mill at issue. In these circumstances, an injunction is appropriate. *See, e.g.*, *Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000).

Finally, Intervenors claim stewardship activities like trail construction and thinning of second growth should justify clear-cutting hundreds of acres of old growth forest this summer. *See* Int. Br. at 36. Building trails and attempting to improve (even in the short term) habitat that has already been destroyed due to old

growth logging cannot offset the immediate and irreparable harm caused by logging even more old growth forests. The suggestion to the contrary is nonsensical. Moreover, the record before the Court demonstrates there are significant questions regarding the putative benefits of thinning on deer. *See, e.g.*, App. 58; FA 63-64.[5]

Respectfully submitted this 13th day of April, 2015.


*s/ Holly A. Harris*

Holly A. Harris (AK Bar # 1105017)
Thomas S. Waldo (AK Bar # 9007047)
Eric P. Jorgensen (AK Bar # 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801-1145
T: 907.500.7133
F: 907.463.5891
E: hharris@earthjustice.org

*Attorneys for Plaintiffs-Appellants Southeast Alaska Conservation Council, et al.*


[5] No bond should be required. Were one appropriate, Appellees have given the Court no means of determining its appropriate amount. *See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (explaining the bond amount may be zero when a party fails to submit any evidence regarding likely damages).

**CERTIFICATE OF SERVICE**

I hereby certify that on April 13, 2015, I electronically filed the foregoing BIG THORNE APPELLANTS' REPLY TO EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL, with attachment, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Respectfully submitted this 13th day of April, 2015.

s/ *Holly A. Harris*
Holly A. Harris
EARTHJUSTICE