Nos. 15-35232, 15-35233, 15-35244

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

IN RE: BIG THORNE PROJECT AND 2008 TONGASS FOREST PLAN

SOUTHEAST ALASKA CONSERVATION COUNCIL, ET AL.,

*Plaintiffs-Appellants,*

CASCADIA WILDLANDS, *et al.*,

*Plaintiffs-Appellants,*

v.

UNITED STATES FOREST SERVICE, ET AL.,

*Defendants-Appellees*

STATE OF ALASKA, ET AL.,

*Intervenor Defendants-Appellees.*

On Appeal from the United States District Court for the District of Alaska

---

# BIG THORNE APPELLANTS' OPENING BRIEF

---

Holly A. Harris
Thomas S. Waldo
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907-586-2751

July 2, 2015

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Southeast Alaska Conservation Council, Alaska Wilderness League, National Audubon Society, and Sierra Club hereby state that none of them has any parent companies, subsidiaries, or affiliates that have issued shares to the public.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......... v

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 2

ISSUES PRESENTED .......... 2

STATEMENT OF THE CASE .......... 3

I. PROCEDURAL HISTORY AND RULINGS PRESENTED FOR REVIEW .......... 4

II. DEER, WOLVES, AND SUBSISTENCE HUNTERS DEPEND UPON THE TONGASS'S OLD-GROWTH FOREST. .......... 5

A. Old-Growth Forest Provides Important Habitat for Deer and Wolves. .......... 6

B. The Forest Service Expects That Big Thorne May Result in a "Significant Restriction" of Subsistence Deer Hunting. .......... 7

III. THE WOLF POPULATION IS ON THE VERGE OF AN ENDANGERED SPECIES ACT LISTING DUE LARGELY TO OLD-GROWTH LOGGING. .......... 8

A. Big Thorne is Located in an Area of the Tongass Subject to the Most Intensive Logging Over the Last Several Decades. .......... 9

B. Big Thorne is Located in an Area That Has Also Experienced Unsustainable Rates of Wolf Mortality. .......... 10

C. Government Scientists Told the Forest Service That the Loss of Old-Growth Habitat is Driving the Decline of the Wolf Population. .......... 11

D. The Forest Service Admitted in the FEIS That It Lacks a Current Wolf Population Estimate, So the Agency Relied on a 1996 Estimate. .......... 12

IV. THE FOREST SERVICE CONCLUDED THAT IT COULD APPROVE BIG THORNE AND STILL MAINTAIN A SUSTAINABLE WOLF POPULATION. .................................................14

A. The Forest Service Based the Wolf Provision on the Wolf Conservation Assessment. ................................................................14

B. Big Thorne Will Drive Deer Habitat Capability Even Farther Below the Wolf Provision at Every Geographic Scale. ......................16

C. The Forest Service Concluded It Could Approve Big Thorne and Still Maintain a Sustainable Wolf Population. .............................18

V. EXPERTS DISAGREED WITH THE FOREST SERVICE'S CONCLUSION THAT IT COULD APPROVE BIG THORNE AND MAINTAIN A SUSTAINABLE WOLF POPULATION. ...........................21

A. Half of the Wolf Task Force Experts Raised Concerns About the Loss of Habitat and the Ability to Support a Sustainable Wolf Population. .........................................................................22

B. Dr. Person Reiterated His Concerns That the Forest Service Could Not Approve Big Thorne and Still Support a Sustainable Wolf Population. .........................................................................23

VI. THE FOREST SERVICE APPROVED BIG THORNE WITHOUT ADDRESSING THE CONCERNS REGARDING WOLF SUSTAINABILITY. .........................................................................25

A. The Forest Service Never Grappled With the Concerns Regarding the Ability to Support a Sustainable Wolf Population. ...........................................................................26

B. The Agency Approved Big Thorne and Clear-Cutting Has Begun. ................................................................................26

VII. THE FOREST SERVICE APPROVED THE LARGEST TIMBER SALE IN DECADES BECAUSE IT PERCEIVED A SIGNIFICANT SHORTFALL IN TIMBER SUPPLY. .........................................................27

VIII. BIG THORNE APPELLANTS' INTERESTS ............................................31

SUMMARY OF THE ARGUMENT ......................................................................32

ARGUMENT ....................................................................................................32

I. STANDARD OF REVIEW ....................................................................................32

II. THE FOREST SERVICE ACTED ARBITRARILY AND VIOLATED NEPA BY FAILING TO CONSIDER THE GAP BETWEEN THE 2006 MARKET DEMAND PROJECTIONS AND ACTUAL CUT LEVELS. ....................................................................33

A. The Gap Between the Demand Projections and Actual Experience Was an Important Part of the Problem in the Big Thorne Decision. ..........................................................................33

B. The Forest Service Arbitrarily Failed to Acknowledge the Gap Between the 2006 Brackley Projections and Actual Cut Levels. .......37

C. Because the Forest Service Failed to Acknowledge the Gap Between the Brackley Projections and Subsequent Experience, the Agency Never Addressed the Reasons for that Gap. ....................40

III. THE FOREST SERVICE VIOLATED NEPA REGULATIONS FOR ADDRESSING MISSING WOLF POPULATION INFORMATION.........44

A. NEPA Regulations Establish Requirements for Addressing Missing Information in an Environmental Impact Statement. ............45

B. The FEIS Violated NEPA's Requirements Governing Missing Information. ..........................................................................46

IV. THE FOREST SERVICE ACTED ARBITRARILY WHEN IT CONCLUDED IT COULD APPROVE BIG THORNE AND STILL PROVIDE FOR A SUSTAINABLE WOLF POPULATION. ....................49

V. THE FOREST SERVICE ACTED UNLAWFULLY UNDER NEPA BECAUSE THE FEIS FAILED TO DISCLOSE THE IMPACTS ON THE ABILITY TO PROVIDE FOR A SUSTAINABLE WOLF POPULATION. ..........................................................................57

VI. RELIEF ....................................................................................................58

CONCLUSION ............................................................................................60

## TABLE OF AUTHORITIES

## CASES

*Am. Iron & Steel Inst. v. EPA*,
115 F.3d 979 (D.C. Cir. 1997) ........................................................................8

*Am. Lung Ass'n v. EPA*,
134 F.3d 388 (D.C. Cir. 1998) ........................................................................41

*Appalachian Power Co. v. U.S. EPA*,
249 F.3d 1032 (D.C. Cir. 2001) ..................................................34, 38, 39, 41, 43

*Burlington Truck Lines v. United States*,
371 U.S. 156 (1962) ........................................................................39

*Cal. Cmtys. Against Toxics v. EPA*,
688 F.3d 989 (9th Cir. 2012) ........................................................................59

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
631 F.3d 1072 (9th Cir. 2011) ........................................................................59

*Columbia Falls Aluminum Co. v. EPA*,
139 F.3d 914 (D.C. Cir. 1998) ........................................................34, 38, 39, 43

*Eagle-Picher Indus., Inc. v. EPA*,
759 F.2d 905 (D.C. Cir. 1985) ........................................................................34

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*,
681 F.2d 1172 (9th Cir. 1982) ........................................................................45

*Friends of the Earth v. Laidlaw Envtl. Servs.*,
528 U.S. 167 (2000) ........................................................................32

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*,
857 F.2d 505 (9th Cir. 1988) ........................................................................45

*High Country Conservation Advocates v. U.S. Forest Serv.*,
52 F. Supp. 3d 1174 (D. Colo. 2014) ........................................................................48

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ........................................................................59

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
387 F.3d 989 (9th Cir. 2004) ....................................................................58, 59

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ..........................................................................49

*Lands Council v. Powell*,
395 F.3d 1019 (9th Cir. 2004) ....................................................................46, 54

*Mass. v. Watt*,
716 F.2d 946 (1st Cir. 1983)...........................................................................60

*Mont. Sulphur & Chem. Co. v. EPA*,
666 F.3d 1174 (9th Cir. 2012) ....................................................................34, 39

*Mont. Wilderness Ass'n v. McAllister*,
666 F.3d 549 (9th Cir. 2011) ......................................................................45, 46

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).............................................................. 33, 39, 40, 44, 55, 57

*N. Alaska Envtl. Ctr. v. Kempthorne*,
457 F.3d 969 (9th Cir. 2006) ..........................................................................57

*N. Plains Res. Council v. EPA*,
645 F.2d 1349 (9th Cir. 1981) ........................................................................34

*Nat'l Parks Conservation Ass'n v. EPA*,
--- F.3d ---, 2015 WL 3559149 (9th Cir. June 9, 2015)..................................33, 39

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
384 F.3d 1163 (9th Cir. 2004) ........................................................................50

*Native Ecosystems Council v. U.S. Forest Serv.*,
418 F.3d 953 (9th Cir. 2005) ..................................................................50, 57, 58

*Native Vill. of Point Hope v. Jewell*,
740 F.3d 489 (9th Cir. 2014) ..........................................................................46

*Native Vill. of Point Hope v. Salazar*,
730 F. Supp. 2d 1009 (D. Alaska 2010) .......................................................48, 49

*Natural Res. Def. Council v. Houston*,
146 F.3d 1118 (9th Cir. 1998) ....................................................................59, 60

*Natural Res. Def. Council v. Jackson*,
650 F.3d 662 (7th Cir. 2011) ..........................................................................34

*Natural Res. Def. Council v. U.S. Forest Serv.*,
421 F.3d 797 (9th Cir. 2005) ...................................................................35, 36, 53

*Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*,
531 F.3d 1114 (9th Cir. 2008) ........................................................................48

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*,
449 F.3d 1016 (9th Cir. 2006) ........................................................................46

*Se. Alaska Conservation Council v. Fed. Highway Admin.*,
649 F.3d 1050 (9th Cir. 2011) ........................................................................59

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947)........................................................................................40

*Sierra Club v. EPA*,
346 F.3d 955 (9th Cir. 2003) ..........................................................................54

*W. Oil & Gas Ass'n v. EPA*,
633 F.2d 803 (9th Cir. 1980) ..........................................................................59

*Yount v. Salazar*,
No. CV-11-8171 PCT-DGC, 2014 WL 4904423 (D. Ariz. 2014).....................48

## STATUTES

5 U.S.C. § 706(2)(A)...........................................................................................59

16 U.S.C. § 529.....................................................................................................34

16 U.S.C. § 539d(a) ..............................................................................................35

16 U.S.C. § 1604(i) ..............................................................................................49

16 U.S.C. § 1604(e) ..............................................................................................34

16 U.S.C. § 3120(a)(3)(A) ....................................................................................35

28 U.S.C. § 1291 .......... 2

28 U.S.C. § 1331 .......... 2

42 U.S.C. § 4321 et seq. .......... 1

## REGULATIONS

36 C.F.R. § 215.15(a) (2013) .......... 21

40 C.F.R. § 1500.1(b) .......... 57

40 C.F.R. § 1502.14(a) .......... 36

40 C.F.R § 1502.22 .......... 2, 3, 32, 45, 46, 47

## FEDERAL REGISTER

51 Fed. Reg. 15,618 (Apr. 25, 1986) .......... 46

79 Fed. Reg. 44,291 (July 31, 2014) .......... 21

## RULES

Fed. R. App. P. 4(a)(1)(B)(ii) .......... 2

Fed. R. App. P. 28(i) .......... 32

In this action Appellants Southeast Alaska Conservation Council, Alaska Wilderness League, National Audubon Society, and Sierra Club (the Big Thorne Appellants) challenge the U.S. Forest Service's decision to approve a massive loss of old-growth forest in Alaska's Tongass National Forest—the Big Thorne timber sale project and the associated road construction (Big Thorne). The Big Thorne Appellants seek not only to prevent the unnecessary and irreplaceable loss of trees that are hundreds of years old, but also to protect the people and the wildlife species that depend upon this extraordinary forest.

## INTRODUCTION

The Tongass's stands of centuries-old trees provide essential habitat for a variety of species, including salmon, bears, goshawks, Sitka black-tailed deer (deer), and the Alexander Archipelago wolf (wolf). Last year, the U.S. Fish and Wildlife Service concluded that the wolf might have to be listed for protection under the Endangered Species Act (the ESA), citing the Forest Service's continued destruction of old-growth habitat. Undaunted by this conclusion, the Forest Service moved ahead with it decision to log roughly 6,200 acres of old-growth forest on central Prince of Wales Island.

In so doing, the Forest Service violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., and acted arbitrarily under the statutes governing Forest Service timber sale decisions and resource protection. First, the

Forest Service's analysis of, and justification for, Big Thorne is based on a flawed market demand analysis that caused the Forest Service to greatly exaggerate the volume goal for needed timber and then concentrate logging in one massive timber sale project. Second, the Forest Service acted unlawfully when it failed to comply with NEPA's regulatory requirements for addressing missing information regarding the status of the wolf population. *See* 40 C.F.R § 1502.22. Third, the Forest Service acted arbitrarily when it concluded it could approve Big Thorne and still maintain a sustainable wolf population.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because the action arises under federal statutes. This Court has jurisdiction based on 28 U.S.C. § 1291 because this is an appeal from a final decision of a district court. The district court issued an opinion disposing of all parties' claims on March 20, 2015, I-ER-3-27, and entered final judgment on March 23, 2015, I-ER-1-2. The Big Thorne Appellants filed the notice of appeal on March 26, 2015, II-ER-31-33, which is within the 60 days allowed for appeals when an agency of the United States is a party. Fed. R. App. P. 4(a)(1)(B)(ii).

## ISSUES PRESENTED

1. Whether the Forest Service violated NEPA and acted arbitrarily in approving Big Thorne because:

(a) The Forest Service ignored real-world markets and relied on an old, pre-crash market demand forecast that greatly exaggerated the need for Tongass timber sales;

(b) The Forest Service acted unlawfully when it failed to comply with NEPA's regulatory requirements for addressing missing information regarding the wolf population in the vicinity of the project, *see* 40 C.F.R § 1502.22; and,

(c) The Forest Service reached an arbitrary conclusion that it could approve Big Thorne and still maintain a sustainable wolf population because it ignored its own planning direction, relied on error-ridden analysis, and ignored relevant factors, including actual habitat quality and wolf mortality.

## STATEMENT OF THE CASE

This case addresses the Forest Service's decision to approve Big Thorne, which is located on the north portion of Prince of Wales Island and encompasses approximately 232,000 acres. III-ER-455. In the Big Thorne Record of Decision (the ROD), the Forest Supervisor approved logging of approximately 6,186 acres of old-growth forest. III-ER-404. The Forest Service also approved construction of approximately 46 miles of new roads and reconstruction of more than 36 miles of existing roads. *Id*. In support of these decisions, the Forest Service prepared the Big Thorne Final Environmental Impact Statement (the FEIS).

## I. PROCEDURAL HISTORY AND RULINGS PRESENTED FOR REVIEW

On August 22, 2014, the Big Thorne Appellants filed their complaint, No. 1:14-cv-00013-RRB, challenging the Forest Service's approval of Big Thorne (the Big Thorne Case). VII-ER-1443-75. A separate group of organizations simultaneously filed a complaint in *Southeast Alaska Conservation Council v. U.S. Forest Service*, No. 1:14-cv-00014-RRB, challenging the Forest Service's decision to adopt the 2008 Amendment to the Tongass Land Management Plan (the Forest Plan Case). VI-ER-1264-84. On August 26, 2014, a third group of organizations also challenged Big Thorne and the Forest Plan, filing a complaint in *Cascadia Wildlands v. Cole*, No. 1:14-cv-00015-RRB (the Cascadia Case). *Cascadia Wildlands*, No. 1:14-cv-00015-RRB, CR 1.

On October 7, 2014, the district court granted the State of Alaska's request to intervene in the Big Thorne Case. CR 25. The district court subsequently granted requests to intervene filed on behalf of various entities and organizations. CR 26, 60-63.

On March 12, 2015, the district court consolidated the three cases, CR 83, and directed that all future filings be submitted under the Big Thorne Case. *Id.*; *see also* CR 84.

On March 16, 2015, the Big Thorne Appellants and the Forest Plan Appellants moved for a preliminary injunction. CR 85.

Ruling on motions for summary judgment filed in all three cases in a single order, the district court upheld the Forest Service's approval of Big Thorne, denying in full all of the Plaintiffs' motions and granting the Federal Defendants' cross-motions. I-ER-27. The district court denied the motion for preliminary injunction as moot. *Id*. The district court subsequently entered judgment for the Federal Defendants. I-ER-1.

On March 26, 2015, the Big Thorne and Forest Plan Appellants appealed the district court's decision. II-ER-31-33; II-ER-28-30. The plaintiffs in the Cascadia Case also filed a notice of appeal. *Southeast Alaska Conservation Council*, No. 1:14-cv-00013-RRB, CR 99.

That same day, the Big Thorne and Forest Plan Appellants moved for an injunction pending appeal. CR 94. The district court granted the motion, enjoining old-growth logging and new road construction activities until April 15, 2015. CR 110 at 1-3.

On April 3, 2015, the Big Thorne Appellants filed an emergency motion for injunction pending appeal. Doc. 10-1. This Court denied that motion and consolidated the three appeals. Doc. 17.

## II. DEER, WOLVES, AND SUBSISTENCE HUNTERS DEPEND UPON THE TONGASS'S OLD-GROWTH FOREST.

The Tongass is a temperate rainforest consisting largely of old-growth trees, meaning trees older than 150 years, III-ER-457, but the dominant trees are

generally more than 300 years old. IV-ER-767; *see also* V-ER-888. As explained below, those trees provide essential habitat for deer and wolves.

A. Old-Growth Forest Provides Important Habitat for Deer and Wolves.

Wolves in Southeast Alaska feed primarily on deer and spend most of their time in low-elevation old-growth forests. III-ER-498. Low-elevation old-growth forest is "particularly important" to deer, because it provides critical winter habitat for deer refuge and forage during periods of heavy snow. *Id*. at 494. For these reasons, the availability of winter habitat, also known as deer habitat capability, is considered the most important limiting factor for deer populations. IV-ER-658.

Because wolves feed on deer, the Forest Service recognizes that deer habitat capability is "a good measure" of wolf habitat. III-ER-498. In fact, the agency has explained that "if deer habitat capability . . . is reduced to such an extent that it can no longer support a reproductively successful pack, it could create a gap in wolf distribution," characterizing this concept as "the most important factor limiting" the wolf's existence. IV-ER-681. Thus, "wolf persistence is directly linked to deer populations and ultimately to deer habitat capability." V-ER-914.

The Forest Service adopted a model to assess the amount of deer habitat capability. *See* III-ER-495, 488; III-ER-419. The agency's deer model considers snow depth, elevation, and forest vegetation, III-ER-419, and assigns the highest value to old-growth forest stands because they intercept snow and provide

understory forage. IV-ER-659. The Forest Service has acknowledged that "the amount of habitat capability reduction . . . is directly related to the amount of timber harvest." IV-ER-673; *see also* IV-ER-683.

The agency uses the results of its deer model to evaluate the impacts of logging decisions on deer, wolves, and subsistence hunters. *See, e.g.,* III-ER-495, 488; III-ER-419. The FEIS explained, for example, that the Forest Service assessed impacts to wolves "in terms of the reduction in deer habitat capability (based on habitat capability model outputs in terms of deer density)." III-ER-505.

B. The Forest Service Expects That Big Thorne May Result in a "Significant Restriction" of Subsistence Deer Hunting.

"Subsistence hunting, fishing, trapping, and gathering activities are a major focus of life for many residents on Prince of Wales Island." *Id*. at 503. People rely on subsistence practices for a variety of reasons including "the ability to provide food or supplemental income; the perpetuation of cultural customs and traditions; and the importance of values associated with self-reliance." *Id*. Of all the terrestrial species in Southeast Alaska, deer support the highest hunting and subsistence use. IV-ER-658. The Big Thorne project area in particular is "an important deer hunting area" for nearby communities. III-ER-462.

The Forest Service acknowledged in the FEIS that Big Thorne's adverse effects on deer raised "special concern" because of the deer's "importance to wolves and subsistence users." *Id*. Indeed, Big Thorne "result[s] in higher risk

that there will be insufficient number of deer to sustain wolves and hunting." III-ER-505. This led the Forest Service to conclude that Big Thorne "may result in a significant restriction of subsistence uses of deer, due to potential effects on abundance, distribution, and competition." III-ER-426.

## III. THE WOLF POPULATION IS ON THE VERGE OF AN ENDANGERED SPECIES ACT LISTING DUE LARGELY TO OLD-GROWTH LOGGING.

Wolves on Prince of Wales Island and the smaller surrounding islands (the Prince of Wales Archipelago) make up a significant percentage of the overall wolf population in Southeast Alaska, "perhaps as much as 30 percent."[1] IV-ER-825. In the mid-1990s, "approximately 250-350 wolves were estimated to inhabit" the Prince of Wales Archipelago. III-ER-497. As explained below, the wolf population has declined so dramatically since then, especially within the north central portion of Prince of Wales Island, the Fish and Wildlife Service concluded last year that it might have to be listed for ESA protection. *See* III-ER-351; IV-ER-826-27.

---

[1] The Prince of Wales Archipelago and Game Management Unit 2 "are essentially the same area with regard to wolves." IV-ER-821; *see also* IV-ER-826. Game management units are geographical areas defined by the Alaska Department of Fish and Game (Alaska Fish and Game) to manage wildlife populations. III-ER-470.

A. Big Thorne is Located in an Area of the Tongass Subject to the Most Intensive Logging Over the Last Several Decades.

Big Thorne is located in an area that historically contained more productive old-growth forest than any other part of the Tongass and, as a result, it has experienced the highest levels of logging. *See* III-ER-489; V-ER-1072 (Fig. 2(b)); IV-ER-644-45 (explaining that the largest trees in the Tongass, as well as those at lower elevations, were logged disproportionately decades ago due to their high productivity and the ease of access).

The Forest Service acknowledged in in the FEIS that due to a concept described as "succession debt" the adverse environmental effects of that past old-growth logging will not be fully realized for decades. *See* IV-ER-673; III-ER-497. In the first 20 to 30 years after an area is logged there is a rapid increase in forage production because of the light created by the loss of the trees. *See* IV-ER-673. After that time, however, there is a 100-150 year period, known as "stem exclusion," during which the trees shade out the forest understory and vegetation dies. *Id.*; *see also* IV-ER-774; V-ER-891 (picture of stem exclusion). Deer habitat and forage availability are at their lowest during stem exclusion. IV-ER-675. This situation is called "succession debt" because the full environmental impacts from logging are not expressed immediately, and will be sustained for many decades after logging. IV-ER-673; *see also* IV-ER-771, 782-87.

B. Big Thorne is Located in an Area That Has Also Experienced Unsustainable Rates of Wolf Mortality.

People on Prince of Wales Island are distributed throughout several small communities, most of which are connected by a road system. *See, e.g.*, III-ER-473-7; V-ER-885a-d, 885f-l. The Forest Service acknowledged in the FEIS that the road system increases wolf mortality, both legal and illegal, due to the increase in access for wolf hunters and trappers. III-ER-499-500.

The Forest Service also explained in the FEIS that hunting and trapping adversely affects the ability of wolves to repopulate vacated areas. "Harvest vulnerability may limit dispersal, and thus the ability of wolves to recolonize territories that have been vacated by trapping and hunting . . . ." *Id*. at 500. In fact, the agency's wolf experts concluded that "[d]ispersing wolves are more vulnerable . . . to hunting and trapping and are more likely to be killed by other wolves" than wolves that do not disperse. II-ER-186. Additionally, of course, the areas that might serve as a population source must themselves "be able to support a sufficient number of wolves to assure . . . continuous, successful dispersal . . . ." VI-ER-1208.

Here, the Fish and Wildlife Service told the Forest Service that wolf mortality has already "been excessive across the project area and other areas of Prince of Wales Island" even without Big Thorne. V-ER-1150 (describing "documented unsustainable annual mortality"). In fact, the Service explained that

almost all of the wildlife analysis areas on the Prince of Wales Archipelago (29 of 32) have exceeded sustainable rates of wolf mortality at least once between 1985 and 2009 and "[m]ost (19 of 32) also had chronically unsustainable harvest." III-ER-356-57 (quotation omitted).

C. Government Scientists Told the Forest Service That the Loss of Old-Growth Habitat is Driving the Decline of the Wolf Population.

Last year, the Fish and Wildlife Service based its conclusion that the wolf might have to be listed for protection under the ESA, in part, on the critical finding that "past timber harvest has reduced habitat quality and availability for Sitka black-tailed deer, the primary prey of wolves in Southeast Alaska." *Id*. at 354 (internal citations omitted). The Fish and Wildlife Service expressed specific concern that the Forest Service was not maintaining enough old-growth habitat to provide adequate deer to maintain a sustainable wolf population. *See id*. at 359-60 (internal citations omitted).

Dr. David Person, who the Forest Service relied on as its principal wolf expert for more than 15 years, expressed similar concerns when he participated in the Big Thorne environmental review.[2] *See* IV-ER-821-25; IV-ER-843-63. He cautioned that wolves are "already facing the possibility of extinction on Prince of Wales Island." IV-ER-832-33. He noted that Big Thorne logging "will remove

[2] Dr. Person is a retired Alaska Fish and Game wildlife biologist with more than 22 years of experience studying wolves and deer in Southeast Alaska and Prince of Wales Island. *See* IV-ER-819.

the most important remaining deer winter habitat . . . [and] [a]s a result, the predator-prey relationship between wolves and deer on Prince of Wales is likely to collapse." *Id*. at 833; *see also id*. at 822 (explaining Big Thorne will remove what remains of "the last high quality winter range for deer"). He opined that the "combined effects of Big Thorne and the other logging on wolves within the Prince of Wales Archipelago likely will be the collapse of a sustainable and resilient predator-prey ecological community." *Id*. at 823. He advised that "the remaining mid and low elevation deer habitat on Prince of Wales Island needs to be protected." *Id*. at 824.

### D. The Forest Service Admitted in the FEIS That It Lacks a Current Wolf Population Estimate, So the Agency Relied on a 1996 Estimate.

The Forest Service acknowledged in the FEIS that it does not know how few wolves remain on the Prince of Wales Archipelago. *See* III-ER-497. The FEIS explained: "Current estimates of the wolf population in [Game Management Unit] 2 are lacking; however, approximately 250-350 wolves were estimated to inhabit Prince of Wales Island and the surrounding islands (Person et al. 1996)." III-ER-497. The FEIS simply speculated that "the population on Prince of Wales Island may be lower than in previous years[,]" reporting only "anecdotal observations." *Id*.

The Forest Service also explained in the FEIS it is working to obtain the current wolf population estimate (the Wolf Population Study).[3] III-ER-501. In the mid-1990s, the Big Thorne project area had sufficient old-growth habitat "to support 45-50 wolves, making up approximately [three] separate packs and a portion of a fourth pack." IV-ER-827. In the fall of 2012, the Wolf Population Study reported there were approximately 29 wolves and only two remaining packs. *Id*. By the spring of 2013, the research team "could only account for six to seven wolves left in the Big Thorne project area." *Id*. at 828; *see also* III-ER-349 (Fish and Wildlife Service explaining the 80 percent wolf mortality rate over the winter of 2012-2013 was "clearly unsustainable"). By the spring of 2014, researchers found even fewer wolves. V-ER-894.

James Kelly, the Forest Service's Interdisciplinary Team leader for the Big Thorne Draft Environmental Impact Statement (the DEIS),[4] explained the developing information: "The current ongoing [wolf] population decline is known to a certain extent even though the [Wolf Population] [S]tudy is not complete." V-ER-903. He cautioned: "Numbers seem to indicate that the population of wolves

---

[3] The Forest Service has funded a study to estimate the wolf population, which Dr. Person led until his retirement. *See* IV-ER-827; *see also* V-ER-898 (Forest Service employee explaining "the funding has been secured"); *id*. at 899 ("Project field work would be extended to Spring of 2015"); V-ER-932-34.

[4] James Kelly is now retired, but served as a NEPA practitioner for the Forest Service from 1992-2012, V-ER-901, and is listed in the FEIS as a major reviewer/contributor, III-ER-523-24.

in the central portion of Prince of Wales Island is approaching zero." *Id.*; *see also id*. at 901 (concluding that the Forest Service "has not taken the requisite 'hard look'" at logging impacts).

## IV. THE FOREST SERVICE CONCLUDED THAT IT COULD APPROVE BIG THORNE AND STILL MAINTAIN A SUSTAINABLE WOLF POPULATION.

In the Forest Plan, the Forest Service adopted a discretionary provision under which the agency seeks to maintain enough old-growth habitat in the matrix lands to support sustainable wolf populations: "Provide, where possible, sufficient deer habitat capability to first maintain sustainable wolf populations, and then to consider meeting estimated human deer harvest demands" (the Wolf Provision). V-ER-1103 (WILD1.XIV.A.2). As a general matter, the agency seeks to accomplish this objective by providing enough habitat to support 18 deer per square mile (based on the deer model described above), but the Forest Plan also requires the agency to consider other factors like local knowledge of habitat conditions when deciding the issue of wolf sustainability. III-ER-601; *see also* III-ER-498; III-ER-419. Here, as explained below, the Forest Service concluded it could approve Big Thorne and still maintain a sustainable wolf population.

### A. <u>The Forest Service Based the Wolf Provision on the Wolf Conservation Assessment.</u>

The Forest Service based the Wolf Provision on a 1996 inter-agency wolf conservation assessment (the Wolf Conservation Assessment) with Dr. Person

serving as its principal author.[5] *See* II-ER-91; IV-ER-796-97; IV-ER-819-21. The Wolf Conservation Assessment explained that when the Forest Service plans timber sales it should "minimize the loss of long-term deer carrying-capacity at geographic scales consistent with the size of wolf pack home ranges," which is approximately 300 square kilometers.[6] II-ER-198, 173; *see also* IV-ER-835; IV-ER-838 (meaning one or two wildlife analysis areas). It never recommended that the Forest Service be free to log so intensively that the majority of wildlife analysis areas in a biogeographic province[7] would fall below the Wolf Provision. *See* II-ER-197 (never contemplating multiple failures in a single province); IV-ER-797.

Providing direction regarding Forest Plan implementation, the Forest Service agreed that the Wolf Provision needed to be applied at the appropriate scale, explaining "[w]olves tend to have home ranges that cross several [w]ildlife [a]nalysis [a]reas[,]" so the agency determined that the Wolf Provision should be applied at the scale of multiple wildlife analysis areas or the biogeographic

---

[5] To avoid redundancy, the Big Thorne Appellants incorporate the discussion of the Forest Service's decision to adopt the Wolf Provision from the opening brief filed in the Forest Plan Case. *See Southeast Alaska Conservation Council*, No. 15-35244, Opening Brief, Statement of the Case, Sec. III, VII, X.

[6] This equals roughly 74,000 acres. VI-ER-1195b (multiplying square kilometers by 247.1 to convert to acres).

[7] The Forest Service uses biogeographic provinces, "which are areas within which certain kinds of plants and animals tend to occur together[,]" in its analysis of biodiversity and wildlife impacts. IV-ER-638. There are 21 biogeographic provinces on the Tongass. *Id*. at 640, 643 (map).

province level. II-ER-169. In 2008, when the agency was developing the Forest Plan, based on Dr. Person's advice it recognized that applying the Wolf Provision "to an area of 300 square kilometers (the average size of wolf pack home range) would be appropriate." II-ER-97; VI-ER-1208b. In 2011, the Forest Service prepared an agency directive that compliance with the Wolf Provision is analyzed using the unit of a wildlife analysis area. V-ER-1164-65; *see also* III-ER-488 (FEIS relying on those directions).

B. <u>Big Thorne Will Drive Deer Habitat Capability Even Farther Below the Wolf Provision at Every Geographic Scale.</u>

In the FEIS, the Forest Service acknowledged the Wolf Provision was to apply at the scale of multiple wildlife analysis areas or a biogeographic province. III-ER-509; *see also id.* at 462 (describing the units of measure for deer habitat capability by wildlife analysis area and biogeographic province in deer per square mile). The FEIS in turn evaluated deer habitat capability at three geographic scales: wildlife analysis areas, Prince of Wales Island, and the North Central Prince of Wales biogeographic province. III-ER-482.

At the level of the individual wildlife analysis areas, the FEIS acknowledged that deer habitat capability in all of the Big Thorne areas already falls below 18 deer per square mile. III-ER-441. Big Thorne will further reduce deer habitat capability to as low as 5.5 deer per square mile. *See* III-ER-515 (describing

cumulative effects of Alternative 3 at stem exclusion, ranging from 5.5 to 14.2 deer per square mile).

The FEIS also reported deer habitat capability for the entire northern portion of Prince of Wales Island, which encompasses roughly 1.4 million acres.[8] Deer habitat capability at this geographic scale will drop to 12.9 deer per square mile at stem exclusion after Big Thorne. III-ER-510 (Table WLD-26 - Northern Portion of Prince of Wales Island (Alt. 3)).

Finally, the agency analyzed deer habitat capability at the still larger scale of the biogeographic province. The FEIS reported that in the North Central Prince of Wales Island Biogeographic Province, which is approximately 1.5 million acres,[9] deer habitat capability will drop to 13.9 deer per square mile at stem exclusion after Big Thorne. III-ER-510 (Alt. 3).

In fact, only six of the 21 wildlife analysis areas in the province currently have enough modeled old-growth habitat to support 18 deer per square mile: 1323, 1525, 1526, 1527, 1529, and 1531. III-ER-554 (Table WL3, Column "Current

[8] The Forest Service included the following wildlife analysis areas in this geographic designation: 1107, 1212, 1213, 1214, 1315, 1316, 1317, 1318, 1319, 1323, 1332, 1420, 1421, 1422, 1527, 1528, 1529, and 1530. III-ER-510 (Table WLD-26, n.3). The area includes approximately 2,173 square miles. III-ER-552 (Table WL3, Column "Sq Mi"). One square mile equals 640 acres, V-ER-912, so 2,173 square miles equals approximately 1.4 million acres.

[9] There are 21 wildlife analysis areas in the North Central Prince of Wales Biogeographic Province, III-ER-510, encompassing approximately 2,408 square miles or approximately 1.5 million acres, III-ER-554.

Year"); V-ER-1019 (map depicting "Current" conditions); *see also* V-ER-1020-21 (submitting errata). Big Thorne will cause areas 1527 and 1529 to drop below the 18 deer per square mile mark. *See* III-ER-554 (Table WL3, Column "Stem Exclusion Stage of Succession, Alt 3"). As a result, only four isolated areas in the northwestern corner of the province will have at least modeled deer habitat sufficient to support 18 deer per square mile. V-ER-1019 (map depicting "Future" conditions).

### C. The Forest Service Concluded It Could Approve Big Thorne and Still Maintain a Sustainable Wolf Population.

The Forest Service concluded that the Big Thorne project area is a population sink for wolves, III-ER-510, because it does not provide the amount of habitat the agency generally considers "sufficient to maintain sustainable wolf populations . . . ." III-ER-424; *see also* III-ER-547 (acknowledging concerns regarding "wolf sustainability"); *id*. at 519 (describing a "reduction in the ability . . . to maintain a sustainable wolf population . . . ."). The agency, nevertheless, concluded it could approve Big Thorne and still provide a sustainable wolf population because wolves would repopulate from other areas in sufficient to numbers to maintain a sustainable population. III-ER-510; *see also* III-ER-423.

The Forest Service based its conclusion that it would be able to maintain a sustainable wolf population on a contractor's report. Though the report acknowledged that the Forest Service applies the Wolf Provision at the scale of

multiple wildlife analysis areas or a biogeographic province, it did not attempt to reconcile that with the fact Big Thorne failed at both scales. *See* III-ER-336. Instead, the report opined that "portions of the larger landscape surrounding the Big Thorne project area would continue to provide sufficient deer habitat to maintain a sustainable wolf population . . . ." *Id*. at 337. Even in this respect, however, the report made several important errors.

First, the contractor erroneously contended that after Big Thorne, six wildlife analysis areas in the province would still have enough modeled habit to meet the 18 deer per square mile mark. III-ER-337 (explaining that "71 percent of [wildlife analysis areas] (15 of 21 [wildlife analysis areas]) in the biogeographic province would support less than 18 deer per square mile at project completion and at stem exclusion . . . ."). Thus, the contractor overstated the available habitat by 33 percent because only four areas in the province—not six— will have modeled habitat to support 18 deer per square mile. *See supra* pp. 17-18. The contractor also relied solely on the modeling results and never examined the actual habitat conditions in any of those areas. *See* III-ER-328.

Second, the contractor also erroneously relied on wildlife analysis 1332 as a source, claiming it has higher modeled deer densities. The report stated that "[w]olves are highly mobile within their territories and nearby [wildlife analysis areas] with higher [modeled] deer densities (e.g., [wildlife analysis areas] 1323 and

1332) would continue to support wolves in the vicinity of the project." *Id*. at 336. The contractor's assertion, however, is not true. In preparing the FEIS, the Forest Service itself acknowledged that wildlife analysis area 1332 does not now nor has it ever had deer habitat capability above 18 deer per square mile. III-ER-554 (Table WL3, Current Year) (explaining the historic deer habitat capability was 14.36 and is currently 12.44 deer per square mile).

Third, the contractor claimed that the Honker Divide old-growth reserve and the Karta wilderness area "may serve as source populations." III-ER-501; *see also* III-ER-328. But both of those areas already lack sufficient old-growth habitat to meet 18 deer per square mile. *See* III-ER-554 (Table WL3, Current Year) (Honker, wildlife analysis areas 1319 (15.80) and 1421 (16.99) and Karta 1316 (15.35)); III-ER-471 (showing wildlife analysis areas 1316, 1319, and 1421); *id*. at 481 (showing location of Honker Divide old-growth reserve and Karta wilderness area); V-ER-1019 (depicting areas currently below 18 deer per square mile).

Despite these mistakes, the Forest Service copied and pasted the text from the contractor's report almost verbatim into the FEIS and the ROD to justify its conclusion that the agency could approve Big Thorne and still maintain a sustainable wolf population. Like the contractor's report, the FEIS acknowledged the appropriate spatial scale of the Wolf Provision was multiple wildlife analysis areas or the province, but never reconciled that with the lack of habitat at both

scales. *See* III-ER-509. The FEIS also erroneously based the agency's sustainability conclusion on the suggestion that six wildlife analysis areas in the province "would continue to provide sufficient deer habitat to maintain a sustainable wolf population . . . ." III-ER-510 (explaining "15 of 21 [wildlife analysis areas] would support less than 18 deer per square mile at project completion and stem exclusion (the same as the current number)"). The FEIS and the ROD also erred in relying wildlife analysis area 1332 as an area that "would continue to support wolves" because it has never had sufficient habitat to sustain wolves. III-ER-336; III-ER-509; III-ER-423. Similarly, the agency cited Honker and Karta as places that could supply wolves to the Big Thorne project area despite the fact that neither has sufficient habitat. *See* III-ER-408; III-ER-501.

## V. EXPERTS DISAGREED WITH THE FOREST SERVICE'S CONCLUSION THAT IT COULD APPROVE BIG THORNE AND MAINTAIN A SUSTAINABLE WOLF POPULATION.

The Tongass Forest Supervisor signed the ROD on June 28, 2013.[10] III-ER-429. The Big Thorne Appellants filed timely administrative appeals of the ROD and the FEIS on August 16, 2013. *See* 36 C.F.R. § 215.15(a) (2013);[11] V-ER-1086-45, 1043-52 (Exs. 1, 5). As part of the appeals, the Big Thorne Appellants

---

[10] In the ROD, the Forest Service adopted a modified version of Alternative 3, the Selected Alternative in the FEIS. III-ER-404.

[11] This regulation was repealed after Plaintiffs filed timely appeals. 79 Fed. Reg. 44,291, 44,291-92 (July 31, 2014).

provided a statement from Dr. Person that further explained his concerns regarding Big Thorne's adverse impacts on the ability to support a sustainable wolf population.[12] *See* IV-ER-818-42; *see also* V-ER-1077-78 (discussing Dr. Person's statement); V-ER-1019-41 (same). The Regional Forester subsequently affirmed the Forest Supervisor's decision, but she refused to allow the agency to implement Big Thorne until the agency prepared a supplemental information report to determine whether the agency had adequately addressed Dr. Person's concerns. *See* IV-ER-865-67.

A. Half of the Wolf Task Force Experts Raised Concerns About the Loss of Habitat and the Ability to Support a Sustainable Wolf Population.

To inform the supplemental information report, the Regional Forester directed the agency to convene an interagency wolf task force (the Wolf Task Force) composed of two members from each of three agencies: the Forest Service, the Fish and Wildlife Service, and Alaska Fish and Game.

Half of the Wolf Task Force, specifically the Forest Service's lead wildlife biologist for the Tongass and the two Fish and Wildlife Service representatives, expressed specific concerns about the Forest Service's ability to support a sustainable wolf population. They concluded that "a need exists for information" relating to the Forest Plan's "effectiveness in maintaining sustainable [wolf]

[12] Dr. Person also expressed opinions regarding wolf viability, but this case, unlike the Forest Plan Case, does not address wolf viability. Thus, this brief focuses only on the Forest Service's response to his concerns regarding wolf sustainability.

populations." V-ER-931. As the Forest Service's lead wildlife biologist for the Tongass admitted: "We cannot say that the wolf population is resilient. The current population may be at an all-time low." V-ER-938 (Comment [BDL11] from Brian Logan). They further advised that the Forest Service should reduce the level of risk to wolves by, among other things, obtaining the current wolf population estimate and cautioned that until the agency has a current estimate, it should "conserve[] . . . important winter habitat for deer." V-ER-931.

### B. Dr. Person Reiterated His Concerns That the Forest Service Could Not Approve Big Thorne and Still Support a Sustainable Wolf Population.

The Forest Service also prepared a draft supplemental information report and solicited comments. Dr. Person commented and provided the Forest Service another written statement, including a series of maps and analyses, again questioning the agency's conclusion that it could maintain a sustainable wolf population, relying on a handful of remote areas to serve as a source for recolonization. *See* IV-ER-799-806, 812-17 (Figs. 1-6); V-ER-1019.

Dr. Person faulted the Forest Service for "fail[ing] to analyze the actual condition of those wildlife analysis areas or explain why they are sufficient to support a sustainable wolf population . . . ." IV-ER-799. He explained, for example, "[w]ildlife analysis area 1526 is mostly a combination of muskeg scrub with alpine and subalpine landscapes that are poor winter habitat for deer" and

"[w]ildlife analysis area 1525 is mostly old stem exclusion seral forest that long ago suffered a major decline in deer habitat, deer population, and opportunity for deer hunters." *Id*. He explained that in some cases, the areas are not even located on Prince of Wales Island. *See id*. at 799-801. He also observed that wolves do not permanently occupy wildlife analysis area 1531 and, "therefore, it cannot function as a source." *Id*. at 800.

Dr. Person also evaluated the size of these outlying areas. *Id*. at 799-800; *see also* IV-ER-835 (explaining a wolf pack's home range is approximately 300 square kilometers). Dr. Person determined that even if they had sufficient old-growth habitat, all but one of the areas are too small to support a wolf pack, ranging in size from 131 to 277 kilometers. IV-ER-799-800.

Dr. Person also disagreed with the Forest Service's suggestion that Honker Divide and Karta could serve as source populations to support a sustainable wolf population. He observed that both areas are too small. *Id*. at 802 (200 and 166 square kilometers, respectively); *id*. at 799. He also explained that the Honker pack has been decimated by hunting and trapping the last two winters, demonstrating that "wolves occupying it are at great risk." *Id*. at 802; *see also* III-ER-827-28. With regard to Karta, which is 'mostly muskeg scrub and a big lake," he explained that "[d]uring [his] 22 years of wolf research in Game Management

Unit 2, [he] never once detected a wolf pack permanently occupying the Karta wilderness area." IV-ER-802.

Finally, Dr. Person explained that the Forest Service failed to address the consequences of wolf mortality on the ability of wolves to repopulate the area in sufficient numbers to reach a sustainable population. *Id*. at 800-01. He explained that the average annual mortality in the outlying wildlife analysis areas would be "well beyond sustainable limits for wolves anywhere in North America." III-ER-800. In the end, he concluded that, even assuming the outlying areas had sufficient deer habitat, which they do not, they cannot serve as a source population. *Id*. at 801.

## VI. THE FOREST SERVICE APPROVED BIG THORNE WITHOUT ADDRESSING THE CONCERNS REGARDING WOLF SUSTAINABILITY.

On August 19, 2014, the Forest Supervisor released the Final Supplemental Information Report (the Final SIR) and affirmed the Big Thorne decision. *See* III-ER-399. In the Final SIR, the Forest Supervisor explained that he "believe[d] important habitat is maintained at the scale of [Prince of Wales Island] to sustain deer and wolf populations and provide for sustainable use of those resources." III-ER-380. Two days later, the Regional Forester concurred with those findings. IV-ER-864.

A. The Forest Service Never Grappled With the Concerns Regarding the Ability to Support a Sustainable Wolf Population.

The Final SIR, however, never responded to any of the concerns that the Forest Service had failed to explain why it concluded it could maintain a sustainable wolf population. *See generally* III-ER-375-402. For example, it did not correct the Forest Service's mistake in overestimating by 33 percent the number of wildlife analysis areas with modeled deer densities over 18 deer per square mile or the agency's mistaken reliance on wildlife analysis area 1332. *See supra* pp. 19-20. The Final SIR never examined the actual habitat conditions or the size of the outlying areas to determine whether they could serve as wolf population sources. Although the Final SIR acknowledged the role of wolf mortality management, *see* III-ER-379-80, it never explained how areas that have already seen wolves decimated, if not completely eliminated, by hunters and trappers could serve as source populations. *See* IV-ER-800-02.

B. The Agency Approved Big Thorne and Clear-Cutting Has Begun.

The Forest Service subsequently offered a sale of 97.7 million board feet (mmbf), III-ER-366, more than two-thirds of the approximately 149 mmbf approved in the ROD, III-ER-404. The agency awarded the sale to the successful bidder, Viking Lumber Company Inc. III-ER-363-64. Logging, and other ground disturbing activities, associated with Big Thorne began in the spring of 2015, at a rate of up to 4.5 mmbf per month. *See Cascadia Wildlands*,

No. 1:14-cv-00015-RRB, CR 86 (Dahlstrom declaration describing expected logging of 144 thousand board feet (mbf) per day).

## VII. THE FOREST SERVICE APPROVED THE LARGEST TIMBER SALE IN DECADES BECAUSE IT PERCEIVED A SIGNIFICANT SHORTFALL IN TIMBER SUPPLY.

The reason the Forest Service decided to proceed with such an enormous timber sale in the face of significant threats to sustainable wolf populations and deer hunting was that the agency perceived an immediate, critical shortfall of several hundred million board-feet in timber supply.

According to the FEIS, "[t]he purpose and need for the Big Thorne Project is to contribute to a long-term supply of economic timber for the timber industry . . . ." III-ER-457. This purpose included the forest plan objectives of seeking to meet market demand for timber and providing "2-3 years supply of volume under contract to local mills," among others. *Id.* The body of the FEIS, however, did not calculate or identify any specific volume numbers to meet these goals. Rather, it incorporated Appendix A for this purpose. *Id.*; *see also id*. at 458, 477, 479, 542-44; III-ER-414.[13]

Appendix A included a chart displaying relatively stable cut levels in recent years, averaging 29-30 mmbf per year in the last three, five, and seven years.

[13] The Big Thorne project was originally conceived as a ten-year contract of 15-20 mmbf per year, but before the public process even began, the purpose was shifted to have a more flexible focus on stewardship. III-ER-454-55.

*See* III-ER-530 (averages calculated from Fig. A-1). The FEIS explained that the Forest Service has an objective of maintaining two to three years of timber supply under contract to local mills. *See id*. at 457. Thus, at recent cut levels, the objective would be about 60-90 mmbf. Appendix A disclosed that the volume under contract at the time of publication of the FEIS was 114 mmbf, *id*. at 539 (Table A-2), well in excess of even the upper end of this range.

Nevertheless, Appendix A concluded that many times more timber was needed to provide a three-year supply, establishing a "2013 Goal" of 429 mmbf under contract. III-ER-539 (Table A-2). To meet this goal, the Forest Service would almost immediately need to supply an additional 315 mmbf under contract—a near quadrupling—to get from the April 2013 level of 114 mmbf to the 2013 goal of 429 mmbf. *Id*. This was more than 14 years of timber at the recent cut levels described above.

The reason for this gap was that Appendix A relied on seven-year-old market demand projections that had proven significantly higher than actual harvest levels. The 2006 Brackley Report, which was written just before the worldwide collapse in housing markets and the Great Recession, had projected steadily rising demand for Tongass timber, hitting 98 mmbf in 2013 under "Scenario 2" and

continuing to rise.[14] *Id*. at 533 (Table A-1). Accordingly, Appendix A adopted Brackley's 98 mmbf as the "projected harvest" for 2013. *Id*. at 534-35 (adopting Scenario 2). In reality, though, actual harvests had generally trended downward and never even hit their 2006 level. *Id*. at 530 (Fig. A-1). As a result, the 98 mmbf Brackley projection adopted in Appendix A was nearly five times the actual harvest from the immediately preceding year. The following chart displays the Brackley projections compared to actual harvest levels and the projection adopted in Appendix A:




[14] Two of the Brackley Report authors published an addendum in 2008, which provided further explanation and clarification but did not change the projections. *See* V-ER-939-82.

*See* III-ER-530 (Fig. A-1), 533 (Table A-1), 534-35 (adopting Scenario 2 for "projected harvest"); IV-ER-698 (Table 3.22-7).

Application of other agency models and procedures then amplified this projection. First, the Forest Service used Brackley's 98 mmbf as the "projected harvest" for purposes of the agency's inventory control model (the Morse methodology), leading to an even higher goal of offering 143 mmbf in 2013.[15] III-ER-534-35; III-ER-558-59 (lines K and Q, Expanded Lumber). To achieve the goal of a three-year supply of uncut timber under contract, the 143 mmbf goal for timber offerings was then tripled to produce the goal of 429 mmbf under contract in 2013. III-ER-539 (Table A-2 & n.5).

Neither the FEIS nor the ROD, nor any other document in the record, analyzes whether the 2006 Brackley projections remained viable in light of subsequent actual experience, or whether the 429 mmbf goal generated by these

[15] The reason the Morse methodology generated an offering goal (143 mmbf) so much higher than the harvest projection (98 mmbf) is that the model attempts to maintain a buffer stock of uncut timber under contract to provide flexibility to timber contractors. *See* IV-ER-872-73; *see also id.* at 874 ("estimates of the volume of timber likely to be purchased in the coming year include the sale volume needed to build the inventory, plus the sale volume needed to replace the projected harvest"). At the time of the FEIS, the uncut volume under contract was 114 mmbf. III-ER-539 (Table A-2). While this level would provide a generous buffer stock for the 29-30 mmbf harvest levels experienced in recent years, it would not provide much flexibility to operators for the projected 98 mmbf cut level. Therefore, to build up an ample buffer stock, the Morse methodology called for new offerings of 143 mmbf—higher than the 98 mmbf projected cut level. *See generally* IV-ER-872-73.

models was a reasonable target for a timber sale program averaging about 29-30 mmbf per year. The 429 mmbf goal was, however, the target adopted in Appendix A, *see id.*, thereby driving the alternatives considered in the FEIS and the decision made in ROD.

## VIII. BIG THORNE APPELLANTS' INTERESTS

The Big Thorne Appellants are conservation organizations, each with a mission to protect the environment, including the Tongass National Forest, its wildlife populations and their natural habitats. Members of the organizations reside near, visit, or otherwise use and enjoy the Tongass and the Big Thorne project area and the wildlife from the area for various purposes, including subsistence, recreation, wildlife viewing, education, research, photography, and aesthetic and spiritual enjoyment. *See, e.g.*, II-ER-276-316; III-ER-317-20. The Big Thorne Appellants' members are injured by the Forest Service's approval of Big Thorne because the logging and road construction activities threaten subsistence hunting, compromise the overall health and natural qualities of the project area, and harm wildlife and habitat. *See* II-ER-276-316; III-ER-317-20. The Big Thorne Appellants have standing to bring this action because they and their members will suffer injuries in fact, those injuries are traceable to the Forest Service's actions, and they would be redressed by a favorable decision of this

Court setting aside the Big Thorne decision as an arbitrary and unlawful action. *See Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-84 (2000).

## SUMMARY OF THE ARGUMENT

In approving this record-breaking sale, the Forest Service violated NEPA and acted arbitrarily under the statutes governing Forest Service timber sale decisions and resource protection. First, the Forest Service's analysis of, and justification for, Big Thorne is based on a flawed market demand analysis that caused the Forest Service to greatly exaggerate the volume goal for needed timber and then concentrate logging in one massive project. Second, the Forest Service acted unlawfully when it failed to comply with NEPA's regulatory requirements for addressing missing information regarding the declining wolf population. *See* 40 C.F.R § 1502.22. Third, the Forest Service reached an arbitrary conclusion that it could approve Big Thorne and still maintain a sustainable wolf population because it ignored its own planning direction, relied on error-ridden analysis, and ignored relevant factors, including actual habitat quality and wolf mortality.

## ARGUMENT

### I. STANDARD OF REVIEW

The Big Thorne Appellants incorporate the standard of review set forth in the Forest Plan Appellants' Opening Brief. *See* Argument, Sec. I; Fed. R. App. P. 28(i).

## II. THE FOREST SERVICE ACTED ARBITRARILY AND VIOLATED NEPA BY FAILING TO CONSIDER THE GAP BETWEEN THE 2006 MARKET DEMAND PROJECTIONS AND ACTUAL CUT LEVELS.

### A. The Gap Between the Demand Projections and Actual Experience Was an Important Part of the Problem in the Big Thorne Decision.

The Forest Service acted arbitrarily by failing to take into account the enormous gap between the 2006 Brackley projections and actual subsequent real-world experience. Where Brackley had projected a steady rise in demand to 98 mmbf by 2013, actual harvest had dropped to 21 mmbf in 2012. *See supra* pp. 28-29. The effect of using 98 mmbf as the 2013 "projected harvest" was that, through multipliers, the Forest Service adopted a goal of securing 429 mmbf of timber under contract. This was more than 14 years of timber at recent cut levels, many times more than needed to meet the stated objective of maintaining two to three years of timber under contract. *See supra* pp. 27-28. This model-generated analysis established the very purpose of the Big Thorne project and led to the largest timber sale in decades, centered in an area of critical concern to wolf populations. *See supra* pp. 6-14.

The substantial gap between the Brackley harvest projections and real-world experience was a "relevant factor" and "an important aspect of the problem," rendering the agency's failure to explain it arbitrary. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983); *see also Nat'l Parks Conservation Ass'n v. U.S. EPA*, --- F.3d ---, 2015 WL 3559149, at *9 (9th

Cir. June 9, 2015) ("[I]f … the model is challenged, the agency must provide a full analytical defense." (alteration in original) (quoting *Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 922 (D.C. Cir. 1985))); *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1054 (D.C. Cir. 2001) (holding application of model arbitrary where agency had not "addressed what appear to be stark disparities between its projections and real world observations"); *Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 923 (D.C. Cir. 1998) (holding a rule arbitrary where the agency "knows that 'key assumptions' underlying the [testing procedure] are wrong"); *Mont. Sulphur & Chem. Co. v. EPA*, 666 F.3d 1174, 1185 (9th Cir. 2012) (reliance on model is arbitrary if agency "ignored reliable data that so undermined the [agency] model projections . . . that reliance on the model was irrational" (second alteration in original) (quoting *N. Plains Res. Council v. EPA*, 645 F.2d 1349, 1362-63 (9th Cir. 1981)); *Natural Res. Def. Council v. Jackson*, 650 F.3d 662, 666 (7th Cir. 2011) ("At some point, preferring predictions over facts is no longer rational.").

The gap between projections and real-world experience with timber needs was important in this case, because the statutes under which the Forest Service operates require the agency to balance timber objectives with other forest values such as wildlife, recreation, and subsistence. *See* 16 U.S.C. § 1604(e) (National Forest Management Act); *id.* § 529 (Multiple-Use Sustained-Yield Act); *id.* §

539d(a) (Tongass Timber Reform Act); *id.* § 3120(a)(3)(A) (Alaska National Interest Lands Conservation Act); *see also Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 808-09 (9th Cir. 2005) (explaining balancing of timber and other goals in the Tongass). The Forest Supervisor explicitly performed such a balancing here, basing his decision to proceed with Big Thorne on "the trade-off between resource protection and social values," III-ER-413, and finding that "the Selected Alternative strikes a balance between meeting the resource needs of the public and protecting the forest resources." *Id.* at 427. He did so despite the acknowledged facts that the decision could significantly restrict subsistence deer hunting, *id.* at 426, and "would result in higher risk that there will be insufficient number [sic] of deer to sustain wolves and hunting." III-ER-505. Thus, an arbitrary calculation of timber needs skews the balance between meeting timber goals and protecting other uses and resources. *See Natural Res. Def. Council*, 421 F.3d at 808 ("[I]f the demand for timber was mistakenly exaggerated, it follows that the timber harvest goal may have been given precedence over the competing environmental and recreational goals without justification sufficient to support the agency's balancing of these goals.").

These errors, because they appear in an environmental impact statement, also violate NEPA by presenting misleading information about timber needs to the public and to the decision-maker. "Presenting accurate market demand

information was necessary to ensure a well-informed and reasoned decision, both of which are procedural requirements under NEPA." *Id*. at 812. By failing to acknowledge or explain the divergence between the harvest projections and real-world experience, the FEIS presents a highly misleading picture of timber needs and the resulting trade-offs with wildlife.

These errors further violated NEPA by constraining the range of alternatives considered in the EIS. "NEPA requires agencies to 'rigorously explore and objectively evaluate all reasonable alternatives' to a proposed plan of action that has significant environmental effects." *Id.* at 813 (quoting 40 C.F.R. § 1502.14(a)). Even the lowest volume action alternative in the FEIS—Alternative 4—was huge, comprising 84.4 mmbf, III-ER-466 (Table 2-1), nearly three years of timber for the entire Tongass and significantly more than any Tongass timber sale project in recent history. The agency ruled out smaller alternatives as inconsistent with the purpose. *Id.* at 465. Had the agency realistically evaluated timber needs, it would have been apparent that much lower volume alternatives, including no timber sale at all, would have sufficed to meet forest-wide timber volume goals while posing significantly less threat to deer and wolves. *See Natural Res. Def. Council*, 421 F.3d at 813-14.

By rejecting lower volume alternatives, the Forest Service proceeded with a timber sale that effectively gave a single purchaser sufficient timber to dominate

the entire Tongass timber sale program for many years to come, a goal never stated. This approach concentrated the adverse impacts of the timber sale program in one area of Prince of Wales Island already at significant risk to deer hunting and wolves from past logging. The calculation of timber volume needs was thus an important part of the problem for which the agency was required to provide a rational explanation.

### B. The Forest Service Arbitrarily Failed to Acknowledge the Gap Between the 2006 Brackley Projections and Actual Cut Levels.

The Forest Service not only failed to explain the large gap between the Brackley projections and reality, but failed even to acknowledge that the gap existed. The closest the FEIS comes is a terse explanation of why the agency chose Brackley's "scenario 2," instead of other scenarios, for the 2013 "projected harvest." The FEIS states that this choice was "due to the export policy and good overseas markets."[16] III-ER-534-35. Even accepting that overseas demand might rise,[17] this cursory explanation failed to take into account that actual timber harvest had fallen far below the Brackley projections and that any future growth would therefore be from a much lower prevailing level of harvest. Where the Brackley

---

[16] The "export policy" in place since 2009 allows Tongass timber purchasers to export a substantial portion of unprocessed logs. III-ER-478.

[17] The evidence in the record suggests that exports would not substantially help, because they were more than offset by weakness in domestic markets: "[E]xports are not likely to keep prices from falling," rendering exports merely a "stabilizing factor" in weak markets. V-ER-1065.

scenario adopted by the Forest Service envisioned a rise from 91 to 98 mmbf between 2012 and 2013 after years of steadily increasing demand, *id*. at 533 (Table A-1), the Forest Service in Big Thorne predicted a near-quintupling in harvest from 21 to 98 mmbf after years of flat or declining harvest levels. *See supra* pp. 28-29.

This was a huge difference. Put another way, Brackley predicted 8% growth from 2012 to 2013 during an extended period of robust markets, while the FEIS projected 367% growth between the same two years, after several years of weak markets. On its face, this was an unlikely projection that cried out for an explanation. *See Appalachian Power Co.*, 249 F.3d at 1053 (computer model's significant underestimate of growth rates, "on its face, raises questions about the reliability of the [agency's] projections"). Moreover, the Forest Service could no longer reasonably claim that it was simply following its expert projections: The real-world decline from 2006 to 2012 followed by the FEIS's sharp projected spike in 2013 bore no resemblance to steady growth that Brackley had projected in 2006. *See supra* p. 29 (chart); *Columbia Falls Aluminum Co.*, 139 F.3d at 923 ("An agency's use of a model is arbitrary if that model 'bears no rational relationship to the reality it purports to represent'" (quoting *Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 1005 (D.C. Cir. 1997))).

Under long-settled principles of administrative law, the failure to provide any explanation for this divergence was arbitrary. "[T]he agency must examine the

relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Here, the agency made no connection—rational or otherwise—between the prevailing actual harvest levels on the Tongass and the selection of a 98 mmbf "projected harvest" for 2013. Instead, the agency mechanically applied a seven-year-old projection without questioning whether it remained viable in light of highly divergent real-world experience. In short, the Forest Service "ignored reliable data" that substantially undermined its model projections, rendering the decision arbitrary. *Mont. Sulphur & Chem. Co.*, 666 F.3d at 1185; *see also Nat'l Parks Conservation Ass'n*, 2015 WL 3559149 at *9 (holding application of model arbitrary where agency "simply offered no response" to a reasoned objection); *Appalachian Power Co.*, 249 F.3d at 1054 (holding decision arbitrary where agency failed to "address[] what appear to be stark disparities between its projections and real world observations"); *Columbia Falls Aluminum Co.*, 139 F.3d at 923 ("Here [the agency] knows that 'key assumptions' underlying the [testing procedure] are wrong and yet has offered no defense of its continued reliance on it.").

Importantly, the claim here does not allege flaws in either the Brackley Report or the Morse methodology. Brackley may have made good projections

based on information known at the time, and the Morse methodology, using sound harvest projections, may be a good way of setting yearly volume goals. The arbitrary action here was the continued reliance on Brackley for harvest projections without taking into account an important aspect of the problem that emerged only after publication of the Brackley Report, *i.e.*, the wide and growing gap between the projections and real-world experience, or, as discussed below, the possible reasons for that gap.

C. Because the Forest Service Failed to Acknowledge the Gap Between the Brackley Projections and Subsequent Experience, the Agency Never Addressed the Reasons for that Gap.

Of course, there could be many explanations for why actual cutting fell so far short of projected demand, but no such explanations are to be found in the record. That is precisely what makes the decision arbitrary. The district court accepted the government's assertion in briefing that "[p]olicy, funding, and litigation . . . have all had an impact on harvest levels," I-ER-12, but there is no evidence in the record that any policy, any lack of funding, or any litigation had significantly constrained harvest levels in the years following the Brackley projections. The Big Thorne Appellants are not aware of any. "The reviewing court should not attempt itself to make up for such deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194,

196 (1947)); *see also Appalachian Power Co.*, 249 F.3d at 1055 (where agency failed to explain divergence between model projections and actual observations, "it will not do for a court to be compelled to guess at the theory underlying the agency's action" (quoting *Am. Lung Ass'n v. EPA*, 134 F.3d 388, 392 (D.C. Cir. 1998))).[18]

The record shows that these factors did not constrain harvest levels, because there was an abundant and growing supply of timber under contract—and therefore immediately available to purchasers—that was not being cut:

| Year | Volume Under Contract (mmbf) | Volume Cut (mmbf) |
|---|---|---|
| 2009 | 84.4 | 28.0 |
| 2010 | 98.4 | 36.0 |
| 2011 | 104.9 | 32.6 |
| 2012 | 130.5 | 20.8 |

III-ER-587 (total "Remaining Vol (MBF)"); III-ER-582; III-ER-576; III-ER-561; III-ER-530. By 2012, the ratio of volume under contract to volume cut was more than 6:1, far in excess of the two to three year supply goal. By the agency's own

[18] In past briefing, the Forest Service and Intervenors have pointed to litigation as the reason for the shortfall, citing statements from the January 2008 FEIS for the forest plan. The flaw in this argument should be obvious: The January 2008 forest plan FEIS was roughly contemporaneous with Brackley, published shortly after the original Brackley Report and before the Brackley addendum. The forest plan FEIS thus could not have addressed whether litigation caused any significant shortfall in the seven years between the Brackley projections and the Big Thorne FEIS. It did not purport to do so.

description, this fact indicates weak demand. IV-ER-877 ("When the volume under contract is rising, it indicates that sale offerings may be running ahead of demand."); *see also id.* at 872-73 (discussing historic contract-to-harvest ratios); IV-ER-701 (same).

The record is replete with evidence for the most obvious cause of this weak demand, but the Forest Service ignored it completely in the FEIS. Shortly after the Brackley Report was published, markets for housing and home mortgages collapsed, causing a global financial crisis and the most severe recession since the Great Depression. This housing-based crash pummeled markets for wood products worldwide, including specifically in Alaska, and recovery has occurred only slowly. *See*, *e.g.*, III-ER-572-73; III-ER-580; III-ER-565; V-ER-1064-65; V-ER-907-11; II-ER-274. These well-documented facts help explain why harvest levels fell so far below the Brackley projections and why timber sale purchasers were not cutting trees despite the steadily growing supply available under contract. Yet Appendix A fails to address any of these facts.

That the failure to address these market changes was arbitrary is made clear in the Brackley Report itself. The 2006 Brackley Report mistakenly predicted "high and almost unprecedented demand" in the Pacific Rim and even higher demand domestically. V-ER-998; *see also* V-ER-967 ("we judge that the probability of a future decrease in demand for lumber to the Pacific Rim is almost

zero"). Of course, the authors had not foreseen the Great Recession, and their predictions proved embarrassingly wrong in hindsight. To their credit, though, the authors recognized and disclosed in the 2006 report itself that Alaska and world markets were changing rapidly. V-ER-1013. Accordingly, they explained in their 2008 update that "[t]he challenge is to ensure that the data put into the model do not become outdated. . . . [O]ne of the challenges in forecasting future demand is that markets are dynamic, and structural conditions change over time." V-ER-959. This was critically important, because their model explicitly assumed no such changes would occur: "we assume no structural shifts in the world's economic and political environment." *Id.* at 966. Given the enormous unforeseen transformations in the markets resulting from the subsequent housing collapse, the financial crisis, and the Great Recession, the Brackley authors themselves would have been the first to recognize the need to reassess their projections. Their explicit recognition of the need to keep the data up to date demonstrates that it was arbitrary for the Forest Service to continue to rely on the projections after markets had changed dramatically. *See Appalachian Power Co.*, 249 F.3d at 1053 (holding decision arbitrary where "even in the face of evidence suggesting the [agency's] projections were erroneous, the [agency] never explained why it adopted this particular methodology.").

Of course, it is not necessary or appropriate for this Court to speculate whether the gap between projections and experience was caused by the market crash or other factors. That the Forest Service failed to acknowledge this gap at all, or to provide any explanation for it or how it affected the Big Thorne decision, is all that is required to hold the decision arbitrary and the FEIS inadequate. Rather than evaluate the large and growing gap between projections and experience, the Forest Service applied its models and projections mechanically and unquestioningly, as though nothing significant had changed. The Forest Service can prevail only if this Court finds that the gap between projections and experience was not a "relevant factor[]" or "an important aspect of the problem." *See State Farm*, 463 U.S. at 42-43. The record shows that it clearly was both: It led the Forest Service to supply vastly more timber than needed, concentrated in a region of the Tongass where deer and wolves were already in grave danger.

## III. THE FOREST SERVICE VIOLATED NEPA REGULATIONS FOR ADDRESSING MISSING WOLF POPULATION INFORMATION.

The Forest Service acknowledged in the FEIS that it lacks a current wolf population estimate. As explained below, the Forest Service acted unlawfully because NEPA regulations require the Forest Service to obtain that missing wolf population information and provide it in the FEIS or to justify its omission, rather than proceeding in an uninformed fashion.

A. <u>NEPA Regulations Establish Requirements for Addressing Missing Information in an Environmental Impact Statement.</u>

"[T]he very purpose of NEPA's requirement that an EIS be prepared for all actions that may significantly affect the environment is to obviate the need for . . . speculation by insuring that available data is gathered and analyzed prior to the implementation of the proposed action." *Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1179 (9th Cir. 1982). Thus, an agency's starting point for any NEPA analysis is to collect and describe baseline data about the environment in which the activity is to occur, because, "[w]ithout establishing the baseline conditions . . . there is simply no way to determine what effect [an action] will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).

When an agency confronts incomplete or unavailable information as part of the environmental review process, NEPA regulations dictate how the agency must address that information. *See Mont. Wilderness Ass'n v. McAllister*, 666 F.3d 549, 559-561 (9th Cir. 2011). "[T]he agency shall include the information in the environmental impact statement," if the missing information is: (1) "relevant to reasonably foreseeable significant adverse impacts;" (2) "essential to a reasoned choice among alternatives;" and (3) "the overall costs of obtaining it are not exorbitant." 40 C.F.R § 1502.22(a). The Council for Environmental Quality

(CEQ) has explained that "[t]he evaluation of impacts under § 1502.22 is an integral part of an EIS and should be treated in the same manner as those impacts normally analyzed in an EIS." 51 Fed. Reg. 15,618, 15,621 (Apr. 25, 1986).

Consistent with the regulation, the Court requires agencies to make these determinations and explain its rationale regarding any missing information. *See Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 496-97 (9th Cir. 2014) (explaining the agency must conduct the analysis required by § 1502.22); *Montana Wilderness*, 666 F.3d at 554; *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016, 1033 (9th Cir. 2006); *Lands Council v. Powell*, 395 F.3d 1019, 1031-32 (9th Cir. 2004).

B. The FEIS Violated NEPA's Requirements Governing Missing Information.

Here, there is no dispute the FEIS acknowledged that the Forest Service is lacking a current wolf population estimate. *See generally* III-ER-497. The agency acted unlawfully because despite this acknowledged missing information the agency never conducted the analysis required by 40 C.F.R. § 1502.22.

As an initial matter, the Forest Service did not conclude that 40 C.F.R. § 1502.22 did not apply because the wolf population information was irrelevant or too costly to obtain. *See* CR 58 at 32 (Doc. 58 at 32) (Federal Appellees only arguing the agency did not comply with 40 C.F.R. § 1502.22 because "the supposedly 'missing' information was not essential to its decision-making")

(emphasis in original). The agency conceded its relevance as demonstrated by the fact that the agency included wolf population information in the FEIS, albeit from an outdated 1996 estimate. *See* III-ER-497. The agency also admitted it has secured funding and is in process of completing the current wolf estimate. *See supra* p. 13 & n. 3. Thus, the only dispute is whether the Forest Service determined that the wolf information was not essential to its Big Thorne decision. *See* 40 C.F.R § 1502.22(a).

Neither the FEIS, the ROD, the Final SIR, nor anything else in the agency's record ever explained that the agency concluded a current wolf population estimate was not essential to the Big Thorne decision. *See* III-ER-497-98 (ignoring 40 C.F.R § 1502.22 altogether); III-ER-421-24 (same); III-ER-375-402 (same); IV-ER-883-85 (same); III-ER-327 (same). Notably, the Forest Service analyzed other missing information in the fashion required by 40 C.F.R. § 1502.22. *See, e.g.*, IV-ER-880-81 (explaining the Forest Service's analysis of missing climate change information). The agency never explained why it did not analyze the missing wolf population information in the same fashion nor, ultimately, why it determined a current wolf population estimate was not essential to its decision.

Unable to point to any explanation from the Forest Service, the attorneys for the Federal Appellees suggested the district court could infer an explanation that the agency never provided. *See* CR 58 at 33 (citing Section II.B.3); *id*. at 16-20.

This argument avoids the explicit requirement of the regulation. "[T]he plain language of § 1502.22 . . . requires the agency to make the[se] findings." *Native Vill. of Point Hope v. Salazar*, 730 F. Supp. 2d 1009, 1018 (D. Alaska 2010). Courts sometimes allow flexible approaches to the location of the analysis, but not the source; the agency—not the attorneys—must provide the explanation. *See High Country Conservation Advocates v. U.S. Forest Serv*., 52 F. Supp. 3d 1174, 1194 (D. Colo. 2014) (accepting agency's explanation in record documents when there was "no evidence" of a problem); *Yount v. Salazar*, No. CV-11-8171 PCT-DGC, 2014 WL 4904423, *12 (D. Ariz. 2014) (accepting agency's explanation provided in the record of decision); *Point Hope,* 730 F. Supp. 2d at 1018 ("'an agency's action must be upheld, if at all, on the basis articulated by the agency itself,' rather than on post-hoc rationalization by its lawyers" (quoting *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 531 F.3d 1114, 1141 (9th Cir. 2008), *amended and superseded*, 625 F.3d 1092 (9th Cir. 2008))).

Here, there are at least two fundamental reasons to be concerned by the Forest Service's failure to consider and decide whether the missing wolf population estimate was "essential" to its decision. *First*, the overwhelming loss of old-growth habitat due to Forest Service logging has become so severe that the wolf is on the verge of an ESA listing. *See supra* pp. 11-12. The Forest Service not only acknowledges that the "most important factor" to the future of the wolf is

that the agency retain sufficient old-growth habitat, IV-ER-681, but here, the Fish and Wildlife Service specifically "urge[d] the Forest Service to use its authority <u>to protect and improve habitat</u> for wolves and their primary prey" III-ER-350 (emphasis added), rather than clear-cutting more habitat than at any time in last twenty years. *Second*, wolf experts told that the agency it should obtain a current wolf population estimate before logging Big Thorne due to the enormous loss of critical old-growth habitat. *See supra* pp. 22-23; IV-ER-805.

In short, the Forest Service acted unlawfully because NEPA regulations require the Forest Service to obtain that missing wolf population information and provide it in the FEIS or to justify its omission, rather than proceed with this record-breaking loss of wolf habitat in an uninformed fashion.

## IV. THE FOREST SERVICE ACTED ARBITRARILY WHEN IT CONCLUDED IT COULD APPROVE BIG THORNE AND STILL PROVIDE FOR A SUSTAINABLE WOLF POPULATION.

Under the National Forest Management Act, the Forest Service must demonstrate that a site-specific project will be consistent with the Forest Plan. 16 U.S.C. § 1604(i); *Lands Council v. McNair*, 537 F.3d 981, 989 (9th Cir. 2008) *overruled on other grounds by Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). Here, the Forest Service acknowledged that the Big Thorne project area is already a wolf population sink but contended that areas outside the project area will supply a sufficient number of wolves to maintain a sustainable wolf

population under the Wolf Provision. *See supra* p. 18. In doing so, however, it ignored its own decision to protect sufficient habitat at the level of a wolf pack, and relied on a contractor's report without conducting its own analysis, addressing conflicting evidence in the record, or even fact-checking the consultant's report. Despite repeated requests, the agency offered no analysis to explain why it concluded the isolated areas are capable of serving as an effective population source to support a sustainable wolf population. *See Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) ("To have not acted in an arbitrary and capricious manner, the agency must present a 'rational connection between the facts found and the conclusions made.'" (quoting *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir. 2004))).

First, the Forest Service's application of the Wolf Provision conflicted with its own implementation directive. The Wolf Conservation Assessment recommended the agency maintain sustainable wolf populations by retaining sufficient matrix old-growth habitat at the geographic scale of a wolf pack's home range, approximately 300 square kilometers or 74,000 acres—about the size of two wildlife analysis areas. *See supra* pp. 15-16. The agency adopted the Wolf Provision to implement the Wolf Conservation Assessment's recommendations, *see supra* p. 14-15, and determined to apply its terms at the scale of multiple wildlife analysis areas or a biogeographic province as needed to account for the

average wolf pack home range of 74,000 acres. *See supra* pp. 15-16. Yet as the result of this decision, the region will lack sufficient habitat to support 18 deer per square mile across both scales: the multiple wildlife analysis areas of the 232,000-acre Big Thorne project area and the North Central Prince of Wales Island Biogeographic Province, encompassing 1.5 million acres. *See supra* pp. 16-17. The following map shows the overwhelming number of wildlife analysis areas that will not meet the Wolf Provision's numerical value of 18 deer per square mile, in red, and those few isolated areas that will, in green.




V-ER-1019 (depicting the Big Thorne project area with slashing). Neither the contractor report nor the FEIS explained how a provision that the Forest Service adopted to maintain habitat at the scale of a wolf pack home range, which the agency concluded meant multiple wildlife analysis areas or maybe a biogeographic province depending on the size of the province, *see supra* pp. 15-16, is satisfied when all of the wildlife analysis areas in the project area and indeed the entire 1.5

million-acre province already lacks sufficient habitat. In fact, the Final SIR explicitly applied the wrong scale; it defended the agency's actions based on an even larger spatial scale, claiming "habitat is maintained at the scale of [Prince of Wales Island] to sustain deer and wolf populations." III-ER-380. As a result, the decision is arbitrary.

Second, the Forest Service based its conclusion that it could approve Big Thorne on fundamental mistakes regarding habitat. In the FEIS, the agency (like its contractor) overstated the number of areas with modeled deer habitat in excess of 18 deer per square mile by 33 percent—six instead of the actual four. *See supra* pp. 17-19, 21. The Forest Service never analyzed or concluded that only the four wildlife analysis areas (1323, 1525, 1526, and 1531) would be sufficient to support a sustainable wolf population. *See supra* p. 21. Additionally, both the ROD and FEIS erroneously relied on wildlife analysis area 1332 to support its sustainability conclusion despite the fact that area has never had deer habitat capability above 18 deer per square mile. *See supra* pp. 19-20. The Forest Service's wolf sustainability conclusion reflects a clear error of judgment, because it is premised on fundamental mistakes regarding the lack of remaining habitat and, therefore, is arbitrary. *Natural Res. Def. Council*, 421 F.3d at 806 ("A 'clear error of judgment' sufficient to be arbitrary and capricious agency action exists when 'the agency offer[s] an explanation that runs counter to the evidence before the agency.'"

(quoting *Sierra Club v. EPA*, 346 F.3d 955, 961 (9th Cir. 2003), *amended by* 352 F.3d 1186 (9th Cir. 2003))).

Third, the Forest Service ignored an important aspect of the problem when it failed to analyze the size and habitat condition of the four wildlife analysis areas, Honker Divide and Karta. The Forest Service not only acknowledges that population sources must themselves be able to support wolves, *see supra* p. 10, but admits that one shortcoming of its deer model is that it "overestimate[s] the value of some large tree stands," which despite their high volume "constitue [sic] poor winter range . . . ." IV-ER-659; *see also* III-ER-495. For this reason, the Forest Plan states explicitly: "Local knowledge of habitat conditions, spatial location of habitat, and other factors need to be considered by the biologist rather than solely relying upon model outputs." III-ER-601. Here, the Forest Service relied solely on the deer habitat modeling results and never considered the actual habitat conditions in those outlying areas to verify whether they had sufficient size and habitat to even support wolves—let alone serve as a population source. *See supra* pp. 19-21, 23-24; *see also Lands Council*, 395 F.3d at 1035 (rejecting the invitation to "trust the Forest Service's internal conclusions of the reliability of the spreadsheet model when the Forest Service did not verify the predictions of the spreadsheet model").

Fourth, the Forest Service acted arbitrarily when it failed to grapple with the evidence in the record demonstrating the four wildlife analysis areas, Honker Divide, and Karta, do not have sufficient size or habitat to serve as population source. *See supra* pp. 20, 24-25. As explained above, Dr. Person actually examined the habitat conditions and size of these locations and concluded they cannot serve as a source population to maintain a sustainable wolf population. *See supra* pp. 24-25. The Forest Service never disputed or even responded to these concerns. *See supra* pp. 20-21, 26. The agency acted arbitrarily when it failed to explain how it reached its sustainable conclusion despite the undisputed facts regarding the lack of habitat. *State Farm*, 463 U.S. at 43; *Sierra Club*, 346 F.3d at 962 (rejecting agency's factual conclusion when it did not dispute asserted facts).

Fifth, the Forest Service never addressed how mortality will affect both the availability of wolves and their ability to successfully repopulate the area. The FEIS explained that "[h]arvest vulnerability may limit dispersal, and thus the ability of wolves to recolonize territories that have been vacated by trapping and hunting . . . ." III-ER-500; *see also* III-ER-329. Here, wolf mortality across the outlying wildlife analysis areas, Honker, and Karta is chronically unsustainable. *See supra* pp. 10-11, 24-25. The agency's experts told the agency that dispersing wolves are even more vulnerable to these mortality risks. *See supra* p. 10. The agency, however, never explained how wolf mortality influenced the agency's

conclusions that a sufficient number of wolves will be able to survive hunting and trapping threats to repopulate the area in sufficient numbers that it will support a sustainable wolf population.

To the contrary, the only record evidence supports the opposite conclusion. As the Forest Service's own Interdisciplinary Team leader explained, "there is an indication that stocks in these [wildlife analysis areas] may have declined as badly as the packs in Central Prince of Wales Island." V-ER-905-06. He cautioned the agency that "information . . . suggests the numbers of wolves and the legal harvest and the [il]legal harvest is as dire as has been predicted by wolf biologists for over a decade." *Id*. at 905. Dr. Person similarly determined that "the expected total average annual mortality [in the outlying areas] would be 57% . . . well beyond sustainable limits for wolves anywhere in the North America" and that does not "include unreported and illegal harvest, which may approach the same level as reported harvest." IV-ER-800-01; *see also* III-ER-329 (Forest Service's contractor explaining mortality should not exceed 38 percent). The agency acted arbitrarily because, having acknowledged the threats associated with wolf mortality and dispersal, it never explained why wolves could overcome those threats in sufficient numbers to support a sustainable wolf population.

In sum, the Forest Service acted arbitrarily because it ignored important aspects of the problem and failed to provide any analysis to support its conclusion

that it can approve Big Thorne and still provide a sustainable wolf population. *See State Farm*, 463 U.S. at 43. As Dr. Person put it, the Forest Service "failed to provide a reasoned basis, supported by the available evidence, that the North Central Prince of Wales Island can sustain a wolf population . . . ." IV-ER-805. For this reason, the agency's decision that it could approve Big Thorne and still maintain a sustainable wolf population was arbitrary. *See State Farm*, 463 U.S. at 43.

## V. THE FOREST SERVICE ACTED UNLAWFULLY UNDER NEPA BECAUSE THE FEIS FAILED TO DISCLOSE THE IMPACTS ON THE ABILITY TO PROVIDE FOR A SUSTAINABLE WOLF POPULATION.

Finally, the Forest Service violated NEPA because the FEIS failed to take a hard look at the impacts of this record-breaking timber project on the region's ability to support a sustainable wolf population. *See N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006).

For all of the reasons previously explained, the FEIS did not disclose the adverse impacts Big Thorne will have on the ability to support a sustainable wolf population. "To take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions . . . ." *Native Ecosystems Council*, 418 F.3d at 964 (citing 40 C.F.R. § 1500.1(b)). Here, the agency's sustainability conclusion ignores its own spatial criteria for applying the Wolf Provision and is premised on fundamental mistakes about how little of Prince of Wales Island has

enough remaining old-growth habitat to support sustainable wolf populations. *See supra* pp. 14-16.

The FEIS, moreover, never analyzed whether wolves were in fact available in the outlying areas and in sufficient number to serve as effective population sources. *See supra* pp. 16-21. It also never examined whether wolves would be able to migrate in sufficient numbers across the island without being killed by hunters or trappers. *See supra* pp. 10-11, 19-21, 56. Indeed the only evidence in the record suggests these areas have very poor habitat, are too small, too isolated, and already suffer from unsustainable rates of mortality. *See supra* pp. 23-25, 26 (Final SIR failing to respond), 56.

In sum, the Forest Service violated NEPA because the FEIS failed to provide a "full and fair" discussion of the potential effects of Big Thorne on wolves, deer, and human hunting opportunities and did not "inform [ ] decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts" on this record-breaking sale. *Native Ecosystems Council*, 418 F.3d at 965 (quoting *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004)).

## VI. RELIEF

The Big Thorne Appellants request that the Court vacate the Forest Service's approval of Big Thorne and remand to the Forest Service with the direction to

comply with the National Forest Management Act, the Multiple-Use Sustained-Yield Act, the Tongass Timber Reform Act, the Alaska National Interest Lands Conservation Act, and NEPA. As explained above, Big Thorne was approved arbitrarily and in violation of these statutes. Compliance is reviewed under the the Administrative Procedure Act (APA). *See Klamath-Siskiyou Wildlands Ctr*., 387 F.3d at 992.

The normal remedy under the APA for an unlawful agency action is to vacate the agency's action and remand to the agency to act in compliance with its statutory obligations. *See* 5 U.S.C. § 706(2)(A) (court shall set aside arbitrary or unlawful actions); *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095-96, 1106 (9th Cir. 2011); *Se. Alaska Conservation Council v. Fed. Highway Admin.*, 649 F.3d 1050, 1056, 1059 (9th Cir. 2011) (affirming the district court's decision to vacate the agency's action); *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1129 (9th Cir. 1998).

Although the Court retains discretion to remand without vacatur where vacatur would cause harm to the environment, *see, e.g.*, *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995), or thwart the objective of the statute at issue, *W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980), there is no reason to depart from the normal remedy of vacatur in this case. *Cf. Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 993-94 (9th Cir. 2012) (noting

vacatur, denied in the case, would result in the "use of diesel generators that pollute the air, the very danger the Clean Air Act aims to prevent").

Here, vacatur would cause no harm to the environment or human health, would further the National Forest Management Act's mandate, and would preserve the opportunity for the Forest Service to analyze the environmental effects of Big Thorne, as contemplated by NEPA. *See Mass. v. Watt*, 716 F.2d 946, 951-52 (1st Cir. 1983); *Houston*, 146 F.3d at 1129.

In the alternative, if the Court elects to depart from the traditional APA remedy of vacatur, then the Big Thorne Appellants ask that the Court remand to the district court for a determination of injunctive relief consistent with the Court's opinion.

## CONCLUSION

The Forest Service violated NEPA and acted arbitrarily when it approved Big Thorne. The Big Thorne Appellants request that the Court vacate this approval and remand to the Forest Service with the direction to comply with NEPA and the statutes governing Forest Service timber sale decisions and resource protection.

Respectfully submitted this 2nd day of July, 2015.

s/ *Holly A. Harris*

Holly A. Harris
Thomas S. Waldo
Eric P. Jorgensen
EARTHJUSTICE

*Attorneys for Plaintiffs-Appellants in Nos. 15-35232 and 15-35244*

## CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(a)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,730 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

Respectfully submitted this 2nd day of July, 2015.

s/ *Holly A. Harris*
Holly A. Harris
EARTHJUSTICE

*Attorneys for Plaintiffs-Appellants in Nos. 15-35232 and 15-35244*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Southeast Alaska Conservation Council, Alaska Wilderness League, National Audubon Society, and Sierra Club state the only related cases are those that have already been consolidated with this one: *Cascadia Wildlands v. Cole*, No. 15-35233, and *Southeast Alaska Conservation Council v. U.S. Forest Service*, No. 15-35244.

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2015, I electronically filed the foregoing BIG THORNE APPELLANTS' OPENING BRIEF and accompanying JOINT EXCERPTS OF RECORD FOR APPELLANTS IN NOS. 15-35232 AND 15-35244with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Respectfully submitted this 2nd day of July, 2015.

s/ *Holly A. Harris*
Holly A. Harris
EARTHJUSTICE

*Attorneys for Plaintiffs-Appellants in Nos. 15-35232 and 15-35244*

**[Colored Page in Printed Brief]**

## ADDENDUM


| STATUTES | Page(s) |
|---|---|
| 5 U.S.C. § 706(2)(A) | A-1 |
| 16 U.S.C. § 529 | A-2 |
| 16 U.S.C. § 539d(a) | A-3 |
| 16 U.S.C. § 1604 | |
| 16 U.S.C. § 1604(e) | A-4 |
| 16 U.S.C. § 1604(i) | A-4 |
| 16 U.S.C § 3120(a)(3)(A) | A-5 |
| 28 U.S.C. § 1291 | A-6 |
| 28 U.S.C. § 1331 | A-7 |

| REGULATIONS | |
|---|---|
| 40 C.F.R. § 1500.1(b) | A-8 |
| 40 C.F.R. § 1502.14(a) | A-9 |
| 40 C.F.R § 1502.22 | A-10-11 |

| RULES | |
|---|---|
| Fed. R. App. P. 4(a)(1)(B)(ii) | A-12 |
| Fed. R. App. P. 28(i) | A-13 |

## 5 U.S.C.A. § 706

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

. . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

. . . .

## 16 U.S.C.A. § 529

## § 529. Authorization of development and administration; consideration to relative values of resources; areas of wilderness

The Secretary of Agriculture is authorized and directed to develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom. In the administration of the national forests due consideration shall be given to the relative values of the various resources in particular areas. The establishment and maintenance of areas of wilderness are consistent with the purposes and provisions of sections 528 to 531 of this title.

## 16 U.S.C.A. § 539d

## § 539d. National forest timber utilization program

(a) Tongass National Forest timber supply; satisfaction of certain market demands

Subject to appropriations, other applicable law, and the requirements of the National Forest Management Act of 1976 (Public Law 94-588), except as provided in subsection (d) of this section, the Secretary shall, to the extent consistent with providing for the multiple use and sustained yield of all renewable forest resources, seek to provide a supply of timber from the Tongass National Forest which (1) meets the annual market demand for timber from such forest and (2) meets the market demand from such forest for each planning cycle.

. . . .

**16 U.S.C.A. § 1604**

**§ 1604. National Forest System land and resource management plans**

. . .

(e) Required assurances

In developing, maintaining, and revising plans for units of the National Forest System pursuant to this section, the Secretary shall assure that such plans--

(1) provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960 [16 U.S.C.A. §§ 528-531], and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness; and

(2) determine forest management systems, harvesting levels, and procedures in the light of all of the uses set forth in subsection (c)(1) of this section, the definition of the terms "multiple use" and "sustained yield" as provided in the Multiple-Use Sustained-Yield Act of 1960, and the availability of lands and their suitability for resource management.

. . .

(i) Consistency of resource plans, permits, contracts, and other instruments with land management plans; revision

Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans. Those resource plans and permits, contracts, and other such instruments currently in existence shall be revised as soon as practicable to be made consistent with such plans. When land management plans are revised, resource plans and permits, contracts, and other instruments, when necessary, shall be revised as soon as practicable. Any revision in present or future permits, contracts, and other instruments made pursuant to this section shall be subject to valid existing rights.

. . . .

## 16 U.S.C.A. § 3120

### § 3120. Subsistence and land use decisions

(a) Factors considered; requirements

In determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands under any provision of law authorizing such actions, the head of the Federal agency having primary jurisdiction over such lands or his designee shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes. No such withdrawal, reservation, lease, permit, or other use, occupancy or disposition of such lands which would significantly restrict subsistence uses shall be effected until the head of such Federal agency--

. . .

(3) determines that (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands,

. . . .

**28 U.S.C.A. § 1291**

## § 1291. Final decisions of district courts

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

## 28 U.S.C.A. § 1331

## § 1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

## 40 C.F.R. § 1500.1

### § 1500.1 Purpose.

. . .

(b) NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

. . . .

## 40 C.F.R. § 1502.14

### § 1502.14 Alternatives including the proposed action.

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

. . . .

## 40 C.F.R. § 1502.22

### § 1502.22 Incomplete or unavailable information.

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

> (1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the Federal Register on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or

amended regulation.

## Federal Rules of Appellate Procedure Rule 4

### Rule 4. Appeal as of Right--When Taken

(a) Appeal in a Civil Case.

(1) Time for Filing a Notice of Appeal.

. . .

(B) The notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from if one of the parties is:

. . .

(ii) a United States agency;

. . . .

**Federal Rules of Appellate Procedure Rule 28**

**Rule 28. BRIEFS**

. . .

(i) Briefs in a Case Involving Multiple Appellants or Appellees. In a case involving more than one appellant or appellee, including consolidated cases, any number of appellants or appellees may join in a brief, and any party may adopt by reference a part of another's brief. Parties may also join in reply briefs.

. . . .